

Opinions of the United
States Court of Appeals
for the Third Circuit

9-18-1996

# Susquenita Sch Dist v. S.

Precedential or Non-Precedential:

Docket 95-7575

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"Susquenita Sch Dist v. S." (1996). *1996 Decisions.* Paper 76.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/76

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 95-7575
_____

SUSQUENITA SCHOOL DISTRICT,

Appellant

v.

RAELEE S., by and through her parents and
next friends, Heidi S. and Byron S.
_____

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civ. No. 95-cv-01063)
_____

Argued
June 4, 1996
Before:  BECKER and MANSMANN, Circuit Judges,
and BROTMAN, District Judge.*

(Filed  September 18, l996
_____

Frank P. Clark, Esquire (ARGUED)
James, Smith & Durkin
134 Sipe Avenue
Hummelstown, PA  17036

   COUNSEL FOR APPELLANT

Jefferson C. Crosby, Esquire (ARGUED)
Gibbel, Kraybill & Hess
41 East Orange Street
Lancaster, PA  17602

   COUNSEL FOR APPELLEE
_____

OPINION OF THE COURT
_____

* 	Honorable Stanley S. Brotman of the United States
District Court for the District of New Jersey, sitting by
designation.

MANSMANN, Circuit Judge.

This matter, arising under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1415 et seq., requires that we determine whether the parents of a student eligible for programs and services under the IDEA are entitled to have their daughter's private school placement funded by the local public school district prior to the conclusion of litigation establishing the propriety of that placement. The case comes to us in an interlocutory posture; the public school district has asked us to review the district court's order denying a Motion for Stay Pending Appeal. This denial effectively directs that the student remain in the private school placement and that this placement be funded by the local public school district pending resolution of the merits of the underlying litigation. Because we conclude that the district court properly declined to enter a stay, we will affirm the order of the district court.

I.

In the academic year 1994–1995, Raelee S., a learning disabled student within the meaning of the IDEA, entered the ninth grade at Susquenita High School. In the summer of 1994, the Susquenita school district had issued a Notice of Recommended Assignment ("NORA") to Raelee's parents and proposed an individualized education program ("IEP"). As of the start of the school year, the parents had not accepted either document. Shortly after school began, however, the parents rejected the NORA and the proposed IEP, withdrew Raelee from Susquenita, and placed her in a private school for the learning disabled. They then invoked their right to a due process hearing pursuant to section 1415(b)(2) of the IDEA in order to determine whether Raelee had been properly placed and whether, accordingly, they were entitled to tuition reimbursement.

In a decision announced in April 1995, the hearing officer found that the IEP which Susquenita had proposed for Raelee was appropriate and that the school district should not be forced to bear the financial burden of the parents' unilateral decision to place Raelee in a private school. The parents appealed this decision to a three member state special education appeals panel. On June 1, 1995, the panel reversed the hearing officer's decision, finding that the proposed IEP was deficient in a number of respects and that "Raelee's educational program was not reasonably calculated to provide for meaningful education benefit." (Special Education Opinion No. 672, Typescript at 13.) Addressing the private school placement, the panel wrote:

> Although the private school is dedicated to
> the education of students with learning
> disabilities and therefore represents a more
> restrictive placement, we find that Raelee's
> current needs in learning outweigh her need
> for integration with nondisabled peers. Thus
> we find the program offered by the private

school appropriate for Raelee.

Id.  The panel then moved to the crux of the issue which we now confront, writing:

> Parents have a right to withdraw their
> children from public school unilaterally
> . . . and receive reimbursement for private
> school tuition when a district has failed to
> provide an appropriate education and when the
> private school meets the substantive
> requirements of IDEA . . . .  Thus we find
> that the parents claim for reimbursement of
> tuition and transportation [for the academic
> year 1994-1995] are legally permissible.

Id. at 6.  Also critical to this controversy is the panel's statement, in dicta, that "unless this order is overturned in a Commonwealth or federal district court, the private school placement shall be the pendent placement in any future disputes between the parent and the District."  Id.

On July 3, 1995, Susquenita filed a Complaint in the Nature of an Appeal from the decision of the special education appeals panel.  Jurisdiction was appropriate under the provisions of 20 U.S.C. § 1415(e)(2) which provides that "any p[arty] aggrieved by the findings and decision made [by a State educational agency] . . . shall have the right to bring a civil action . . . in a district court . . . ."

In the complaint, Susquenita alleged that the education appeals panel improperly disregarded the credibility determinations made by the hearing officer, made findings of fact not supported by the record, and, most importantly for purposes of this appeal, in identifying the private school as Raelee's pendent placement and in awarding tuition reimbursement.  In a contemporaneous motion for stay pending appeal filed pursuant to Fed. R. Civ. P. 62(d) and (f), Susquenita asked that the district court stay the appeals panel decision "insofar as it directs Susquenita to reimburse the parents for expenses and . . . states that Raelee's placement within the meaning of 20 U.S.C. § 1415(e)(3) is a private school."

The district court denied Susquenita's motion, noting that "Rule 62(d) requires an analysis similar to that employed in evaluating a request for a preliminary injunction."  (Typescript at 5.)  The court identified four factors to be considered, including:  1) the movant's likelihood of success on the merits; 2) whether the movant will suffer irreparable harm if the request is denied; 3) whether third parties will be harmed by the stay; and 4) whether granting the stay will serve the public interest.

The district court evaluated each of these factors, concluding first that the likelihood of Susquenita's success on the merits was very difficult to predict.  The court found, however, that, "on the current state of the record made at the administrative level, we would conclude that the likelihood of success favors Raelee S."  (Typescript at 4.)  The court also found the public interest factor difficult to evaluate, stating

that while the public interest favored Raelee's receiving a free and appropriate education, the state of the record made it difficult to assess whether Raelee received such an education in the Susquenita School District. The court concluded, however, that "were we compelled to make such an assessment at this juncture, we would be constrained to come down on the side of [Raelee S.]." Id. The court next found that third parties would not be harmed if the stay were denied:

> The only harm which we can conceive of is the financial burden which will be borne by the district during the pendency of this appeal. We have nothing before us to suggest that other students will be denied a proper or adequate education if the order compelling the district to fund her private school remains in effect during the pendency of this appeal.

Id.

Evaluating Susquenita's allegation of irreparable harm, the district court found that, under current caselaw, the district would not be entitled to recover funds expended to maintain Raelee in private school even if it were to prevail on appeal. The court thus found merit in Susquenita's argument that it would suffer irreparable harm if the stay were denied. The court, however, did not find this prospect of harm sufficient to justify granting the stay. "Taken together, we find that the relevant considerations do not justify granting the stay requested by the district." (Typescript at 4.)

Accordingly, the district court denied Susquenita's motion for a stay and held that Raelee's "`current educational placement' for section 1415(e)(3) purposes will remain the private school . . . during the pendency of this appeal and until further order of the court declaring otherwise." (Typescript at 5). This holding also effectively decided the reimbursement question in favor of Raelee's parents. This appeal followed. We have jurisdiction pursuant to 28 U.S.C. § 1291; we review the district court's order under an abuse of discretion standard. Sierra Club v. Cedar Point Oil Co., 73 F.3d 546 (5th Cir. 1996).

II.

The broadest issues in this litigation are those relating to the adequacy of the IEP proposed by Susquenita; these are the merits issues yet to be addressed by the district court. The issues underlying the district court's denial of the stay are narrow, involving practical questions of where Raelee should attend school while the review process proceeds, who must pay for Raelee's placement, and when that payment must be made. Susquenita argues that it has no financial obligation to Raelee's parents because the private school is not the appropriate pendent placement. Alternatively, Susquenita contends that any financial obligation which it may have can be assessed only at the end of the appellate process. These issues of pendent placement and financial responsibility are linked; in order to evaluate the

payment questions, we must first assess the legal impact of the education appeals panel directive that the private school be deemed Raelee's pendent placement during the review process.

## III.

The pendent placement concept is an important feature of the IDEA. In 1975 Congress enacted legislation appropriating funds to help states defray the cost of educating children with disabilities. The IDEA, known originally as the Education of the Handicapped Act, was passed in order "to assure that all children with disabilities have available to them . . . a free appropriate public education which emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 14000(c). The IDEA resulted, in part, from a congressional determination that:

> handicapped children were not being properly educated and were, in most instances, excluded from the classroom. Congress concluded that the problem was the result not only of financial constraints at state and local levels but was also due to state and local laws which enabled school districts to exclude children without consultation with their parents.

Thomas v. Cincinnati Board of Education, 918 F.2d 618, 619 (6th Cir. 1990). See also H.R. Rep. 332, 94th Cong., 1st Sess.

To be eligible for federal funding, states and local agencies are required by the IDEA to comply with federal guidelines and regulations established to ensure the availability of a "free appropriate public education" for all of their disabled children. 20 U.S.C. § 1412(1). State and local compliance with the IDEA is monitored by federal review, see 34 C.F.R. §§ 104.61, 100.7, and by procedural safeguards extended to handicapped children and their parents. These safeguards are meant to "guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think inappropriate". Honig v. Doe, 484 U.S. 305, 311-12 (1988). "Congress repeatedly emphasized throughout the Act the importance of parental participation in both the development of the IEP and any subsequent assessments of its effectiveness. See §§ 1400(c), 1401(19), 1412(7), 1415(b)(1) (A), (C), (D), (E), and 1415(b)(2)." Id.

Several of the Act's procedural safeguards are relevant to this case. First, the Act requires that a school district give a child's parents written notice of any proposed changes in the child's established educational program. 20 U.S.C. § 1415(b)(1)(C). If the parents object to proposed changes, they are authorized to seek an impartial administrative hearing on the matter, id. at § 1415(b)(2), and to appeal any adverse decision to state or federal court. Id. at § 1415(e)(2). Finally, the Act requires that during the course of administrative and judicial proceedings, "the child shall remain in the then current

educational placement."  Id. at 1415(e)(3).  This requirement has come to be known as the IDEA's "pendent placement" or "stay put" provision.

The pendent placement provision impacts to some degree virtually every case involving an administrative challenge under the IDEA.  A child's placement during the course of administrative and judicial proceedings typically has great significance for all concerned.  "Where as in the present case review of a contested IEP takes years to run its course -- years critical to the child's development -- important practical questions arise concerning interim placement of the child and financial responsibility for that placement."  School Comm. of the Town of Burlington v. Department of Educ., 471 U.S. 359, 361 (1985).      The pendent placement provision was included in the IDEA to protect handicapped children and their parents during the review process.  The Supreme Court referred to this protective purpose when it wrote:

> We think it clear . . . that Congress very much meant to strip schools of the unilateral authority they had traditionally employed to exclude disabled students . . . from school.

Honig v. Doe, 484 U.S. at 323.  A similar view of the provision was articulated in Burlington, 471 U.S. at 373:

> We think at least one purpose of § 1415(e)(3) was to prevent school officials from removing a child from the regular public school classroom over the parents' objection pending completion of the review proceedings . . . .  [T]he impetus for the Act came from two federal-court decisions, Pennsylvania Assn. for Retarded Children v. Commonwealth, 334 F. Supp. 1257 (E.D. Pa. 1971), and 343 F. Supp. 279 (1972), and Mills v. Board of Education of District of Columbia, 348 F. Supp. 866 (D.C. 1972), which arose from the efforts of parents of handicapped children to prevent the exclusion or expulsion of their children from the public schools.  Congress was concerned about the apparently widespread practice of relegating handicapped children to private institutions or warehousing them in special classes.  We also note that § 1415(e)(3) is located in a section detailing procedural safeguards which are largely for the benefit of the parent and the child.

(citations omitted).  We, too, have recognized the policy concerns underlying the pendent placement provision:

> The provision represents Congress' policy choice that all handicapped children, regardless of whether their case is meritorious or not, are to remain in their current educational placement until the

> dispute with regard to their placement is
> ultimately resolved.

Drinker v. Colonial School District, 78 F.3d 859, 864-65 (3d Cir. 1996) (citing Woods v. New Jersey Dep't of Educ., No. 93-5123, 20 Indiv. Disabilities Educ. L. Rep. (LRP Publications) 439, 440 (3d Cir. Sept. 17, 1993)).

Given the protective purpose underlying the pendent placement provision, it is often invoked by a child's parents in order to maintain a placement where the parents disagree with a change proposed by the school district; the provision is used to block school districts from effecting unilateral change in a child's educational program. In cases of this type we have directed that "the dispositive factor in deciding a child's `current educational placement' should be the Individualized Education Program . . . actually functioning when the `stay put' is invoked." Drinker, 78 F.3d at 867 (quoting Woods, 20 Indiv. Disabilities Educ. L. Rep. (LRP Publications) at 440). According to Susquenita, the last functioning IEP was in the public school system and, therefore, the public school placement must remain Raelee's pendent placement for the duration of this litigation.

This case, however, differs from many in which a child's pendent placement is at issue.

Here, it is the parents who advocate change. Mr. and Mrs. S. have no interest in having their daughter remain in the public school system under the terms of either the former or the proposed IEP. Because Raelee's parents concluded that the program proposed for their daughter was inadequate and contrary to her best interest, they chose not to invoke the protection of the stay-put provision, opting instead to place Raelee in a private school at their own expense. Prior to the time that the education appeals panel announced its decision, then, the pendent placement provision was inoperative.

At the time of her transfer to the private school, Raelee's parents did not dispute that the public school would have been the appropriate pendent placement within the meaning of the IDEA. The parents argue, however, that the pendent placement and, therefore, the financial responsibility landscape was altered when the state education appeals panel ruled in their favor on June 1, 1995. We agree.

In its decision the appeals panel found that the IEP which Susquenita proposed for Raelee was inadequate and that the private school placement was appropriate. The panel directed that the private school be deemed Raelee's pendent placement in any future disputes "unless the [panel] order is overturned in a Commonwealth or federal district court." (Typescript at 14 n.27). Relying on this panel directive, the parents argue that a new pendent placement was created and that, from the time of the panel decision forward, Susquenita is required to bear the financial burden of maintaining Raelee at the private school. The parents' position is derived directly from the language of the statute. As we have noted, section 1415(e)(3) of the Act reads as follows: "During the pendency of any proceedings conducted pursuant to this section, unless the state or local

educational agency and the parents or guardian otherwise agree, the child shall remain in the then current educational placement. . . ."

The decision of the Supreme Court in Burlingtonestablished that a ruling by the education appeals panel in favor
of the parents' position constitutes agreement for purposes of section 1415(e)(3). In Burlington, the Supreme Court noted that while parents who unilaterally remove their child from a prior placement

> contravene[] the conditional command of § 1415(e)(3) that "the child remain in the then current educational placement,' . . . we note that the section calls for agreement by either the state or the local educational agency. The [appellate panel]'s decision in favor of the [parents] and the [private school] placements would seem to constitute agreement by the state to the change of placement.

471 U.S. at 372.

Susquenita argues that a pendent placement appropriate at the outset of administrative proceedings is fixed for the duration of the proceedings and cannot be altered by an administrative ruling in the parents' favor. Accepting this position would contravene the language of the statute and the holding in Burlington. Furthermore, it would mean that the panel decision in favor of the parents is of no practical significance unless and until it is affirmed by a decision that cannot be or is not appealed.

As we have explained, section 1415(e)(3) was drafted to guard the interests of parents and their children. We cannot agree that this same section should be used here as a weapon by the Susquenita School District to force parents to maintain a child in a public school placement which the state appeals panel has held inappropriate. It is undisputed that once there is state agreement with respect to pendent placement, a fortiori, financial responsibility on the part of the local school district follows. Thus, from the point of the panel decision forward -- academic years 1995-1996 and following -- Raelee's pendent placement, by agreement of the state, is the private school and Susquenita is obligated to pay for that placement.

IV.

Resolution of the pendent placement question does not end our discussion. Susquenita contends that even if the appeals panel decision is construed as an agreement to a "new" pendent placement giving rise to financial responsibility on the part of the school district, this responsibility is not immediate. According to Susquenita, the Supreme Court's decision in Burlington mandates that prospective tuition reimbursement or reimbursement "pendente lite" be barred under the IDEA; without exception, Susquenita argues, parents initiating an administrative challenge under the IDEA must bear the financial

burden of alternative placement until such time as the propriety of that placement is conclusively established. We decline to adopt this restrictive reading of the Court's holding in Burlington; we conclude that a school district may be required to pay for tuition and expenses associated with a pendent placement prior to the conclusion of litigation.

Although Burlington arose in a procedural context which made discussion of retroactive reimbursement appropriate, we believe that the concerns underlying that decision apply with equal force to tuition payments coming due during the pendency of litigation. Thus, while the holding in Burlington is not controlling in this case, the analysis employed and concerns expressed by the Supreme Court are useful in resolving the issue now before us. In Burlington, the Supreme Court addressed two narrow questions: "Whether the potential relief available under § 1415(e)(3) includes reimbursement to parents for private school tuition and related expenses, and whether § 1415(e)(3) bars such reimbursement to parents who reject a proposed IEP and place the child in a private school without the consent of local school authorities." Burlington, 471 U.S. at 367.

The Court first reviewed the purposes underlying the IDEA and concluded that the grant of authority to the reviewing court set forth in section 1415(e)(2) is sufficiently broad to include the power to order school authorities to reimburse parents for private school expenditures where the court ultimately determines that private, rather than public, education under a proposed IEP is appropriate. The Court reasoned as follows:

> A final judicial decision on the merits of an IEP will in most instances come a year or more after the school term covered by the IEP has passed. In the meantime, the parents who disagree with the proposed IEP are faced with a choice: go along with the IEP to the detriment of their child if it turns out to be inappropriate or to pay for what they consider to be the appropriate placement. If they choose the latter course . . . it would be an empty victory to have a court tell them several years later that they were right but that these expenditures could not in a proper case be reimbursed. . . . If that were the case, the child's right to a free appropriate public education, the parents' right to participate fully in developing a proper IEP and all of the procedural safeguards would be less than complete.

471 U.S. at 370.

Having established that reimbursement may be ordered where a private school placement is found to be appropriate, the Court then held that parents who initially decline the pendent placement protection of section 1415(e)(3) do not automatically forfeit their right to reimbursement. The Court explained that

section 1415(e)(3) does not speak to financial responsibility or to a parent's right to reimbursement at the close of judicial proceedings:

> If the provision is interpreted to cut off parental rights to reimbursement, the principal purpose of the Act will in many cases be defeated in the same way as if reimbursement were never available . . . . [Parents would be] forced to leave the child in what may turn out to be an inappropriate educational placement or to obtain the appropriate placement only by sacrificing any claim for reimbursement.

Id. at 372.

While we recognize that Burlington dealt with retroactive relief, we do not believe that the Supreme Court's analysis should be confined to those cases arising in a procedural context identical to that presented in Burlington. We conclude that the policies underlying the IDEA and its administrative process favor imposing financial responsibility upon the local school district as soon as there has been an administrative panel or judicial decision establishing the pendent placement.

Nothing in the Act or in its legislative history convinces us that Congress intended to shield school districts from financial responsibility prior to the close of litigation. The IDEA was enacted to guarantee handicapped children a free and appropriate education and its legislative history is devoid of any indication that Congress intended to limit the timing of a school district's financial obligations in accordance with some pre-determined formula. Resolution of financial disputes is not governed by rigid rules but is, instead, committed to the administrative process.

> If a parent contends that he or she has been forced, at that parent's own expense, to seek private schooling for the child because an appropriate program does not exist within the local educational agency and the . . . agency disagrees, that disagreement and the question of who remains financially responsible is a matter to which the due process procedures . . . app[ly].

S. Rep. No. 94-168 p. 32 (1975), U.S. Code Cong. & Admin. News 1975 pp. 1425, 1456.

In fashioning remedies under the IDEA, the courts are directed to "grant such relief as [they] deem[] appropriate." 20 U.S.C. § 1415(e)(3). The Supreme Court in Burlington fleshed out the contours of "appropriate relief" when it wrote:

> The ordinary meaning of these words confers broad discretion on the court. The type of relief is not further specified except that it must be "appropriate." Absent other

> reference, the only possible interpretation is that the relief is to be "appropriate" in light of the purposes of the Act. As already noted, this is principally to provide handicapped children with "a free appropriate public education which emphasizes special education and related services designed to meet their unique needs." The Act contemplates that such education will be provided where possible in regular public schools . . . but the Act also provides for placement in private schools at public expense where this is not possible. In a case where a court determines that a private placement desired by the parents was proper under the Act and that an IEP calling for placement in a public school was inappropriate, it seems clear beyond cavil that "appropriate" relief would include a prospective injunction directing the school officials to develop and implement at public expense an IEP placing the child in a private school. . . . If the administrative and judicial review under the Act could be completed in a matter of weeks, rather than years, it would be difficult to imagine a case in which prospective injunctive relief would not be sufficient.

471 U.S. 369–70.

> Delay, however, is inevitable and this delay carries with it financial consequences. Concluding that "appropriate relief" under the IDEA includes retroactive tuition reimbursement, the Court explained that where parents elect to pay for what they believe is an appropriate placement,

> > it would be an empty victory to have a court tell them several years later that they were right but that these expenditures could not . . . be reimbursed . . . . If that were the case, the child's right to a free appropriate public education, the parents' right to participate fully in developing a proper IEP, and all of the procedural safeguards would be less than complete. Because Congress undoubtedly did not intend this result, we are confident that by empowering the court to grant "appropriate" relief Congress meant to include retroactive reimbursement to parents as an available remedy in a proper case.

Id. We are convinced that the concerns cited by the Court in support of retroactive reimbursement favor including the interim assessment of financial responsibility in the range of relief available under the IDEA.

In this case, as in many other cases, while parents wait for the merits of their case to be addressed through the process of administrative and judicial review, they who disagree with an IEP proposal for their child must make a choice.  They may have the child remain in what they believe to be an inappropriate placement or they may elect to pay for what they deem appropriate.  This choice is real only for parents who have the financial wherewithal to pay for alternative placement.  While parents who reject a proposed IEP bear the initial expenses of a unilateral placement, the school district's financial responsibility should begin when there is an administrative or judicial decision vindicating the parents' position.  The purpose of the Act, which is to ensure that every child receive a "free and appropriate education" is not advanced by requiring parents, who have succeeded in obtaining a ruling that a proposed IEP is inadequate, to front the funds for continued private education.

The burden that such an approach would place on many families is overwhelming.  The cost of private education, especially in institutions specializing in teaching the learning disabled, is substantial.  Families without means would be hard pressed to pay for private education in what will almost invariably be the significant time lapse between a ruling in their favor and the ultimate close of litigation.  "The review process is ponderous."  Burlington, 471 U.S. at 370.  Without interim financial support, a parent's "choice" to have his child remain in what the state has determined to be an appropriate private school placement amounts to no choice at all.  The prospect of reimbursement at the end of the litigation turnpike is of little consolation to a parent who cannot pay the toll at the outset.

In concluding that the school district cannot avoid interim responsibility for funding what the state has agreed is an appropriate pendent placement, we are mindful of the financial burden which will, in some instances, be borne by local school districts.  At the risk of seeming cavalier, however, we adopt the Supreme Court's statement in Florence County School District Four v. Carter, 114 S. Ct. 361, 366 (1993):

> There is no doubt that Congress has imposed a significant financial burden on the States and school districts that participate in IDEA.  Yet public educational authorities who want to avoid reimbursing parents for the private education of a disabled child can do one of two things:  give the child a free appropriate public education in a public setting, or place the child in an appropriate private setting of the State's choice.  This is IDEA's mandate, and school officials who conform to it need not worry about reimbursement claims.

                           V.
            Our holding in this matter has three components.
First, the private school placement, by virtue of the education
appeals panel decision, is the appropriate pendent placement for
purposes of 20 U.S.C. § 1415(e)(3).  Second, the Susquenita
School District is required to fund that placement.  Finally, the
district's financial obligations with respect to the pendent
placement are immediate and may not be deferred until the close
of litigation.  These requirements are distilled from the
unambiguous language of the IDEA, the Act's legislative history,
and the caselaw interpreting the Act.  Given the clarity of the
law with respect to the issues before us, we have no difficulty
concluding that the district court's denial of Susquenita's
motion for stay was consistent with the sound exercise of
judicial discretion.  We will, therefore, affirm the order of the
district court.