**BAYONNE BOARD OF EDUCATION,
Plaintiff,**

v.

**R.S., by his parents K.S. and
S.S., Defendant.**

**Civil Action No. 96–4835 (AJL).**

United States District Court,
D. New Jersey.

Jan. 2, 1997.

James L. Plosia, Jr., Apruzzese, McDermott, Mastro & Murphy, P.C., Liberty Corner, for Plaintiff.

Herbert D. Hinkle, Lawrenceville, for Defendant.

## OPINION

LECHNER, District Judge.

This is an action by the Bayonne Board of Education (the "Bayonne Board") against defendants R.S. ("R.S."), by his parents K.S. and S.S. On 18 October 1996, the Bayonne Board filed a verified complaint (the "Complaint") seeking review, pursuant to 20 U.S.C. § 1415(e)(2), of the 9 October 1996 decision of Administrative Law Judge Margaret M. Hayden ("ALJ Hayden") (the "ALJ Hayden Decision"). Complaint, ¶ 3. ALJ Hayden held that, pursuant to 20 U.S.C. § 1415(e)(3), and pending litigation over a Due Process Petition filed by R.S., the Bayonne Board was to pay all costs associated with R.S.'s placement at the Alpine School (the "Alpine School"), a private school for pre-school handicapped students in Bergen County, New Jersey. Complaint, ¶ 3; Bay-

onne Board 12G Statement, ¶ 3. The parties have both moved for summary judgment in the instant action, which they have "agreed ... would dispose of the case."[1] Bayonne Board Moving Brief at 1; R.S. Moving Brief at 3 ("There are no facts in dispute for the purpose of adjudicating the ... cross-motions."). For the reasons which follow, the Bayonne Board Motion for Summary Judgment is denied; the R.S. Motion for Summary Judgment is granted.

*Facts*

A. *Parties*

The Bayonne Board "is a body corporate and politic responsible for the provision of education to the students enrolled in the public schools of the City of Bayonne." Complaint, ¶ 1. R.S. is a minor child who resides with his parents within the City of Bayonne. *Id.,* ¶ 2.

B. *Background*

R.S. is autistic and has been classified as pre-school handicapped by the Bayonne Child Study Team. Bayonne Board 12G Statement, ¶ 4. During the 1994–1995 school year, R.S. was educated in a pre-school handicapped class in the Bayonne school district (the "Bayonne Program"). *Id.,* ¶ 5. In September of 1995, R.S.'s parents unilaterally placed him at the Alpine School, for the 1995–1996 school year. *Id.,* ¶ 6. In November of 1995, R.S.'s parents filed a Due Process Petition with the New Jersey Division of Special Education (the "Division of Special Education") asking that the Bayonne Board be required to reimburse them for the cost of R.S.'s education at the Alpine School. *Id.,* ¶ 7. The matter was transmitted by the Division of Special Education to the New Jersey Office of Administrative Law, which scheduled hearings in February of 1996. *Id.*

1. *The Settlement*

On 28 February 1996, after two days of hearings before Administrative Law Judge Arnold Samuels, the parties reached an agreement "which was memorialized as a Stipulation of Settlement" (the "Settlement"). Bayonne Board 12G Statement, ¶ 8. The Settlement provided the Bayonne Board would pay R.S.'s costs at the Alpine School starting on 1 March 1996 and that R.S. would be transferred to the Bayonne Program in September 1996 if certain conditions were met. The Settlement specifically provided:

A. The Bayonne Board ... *will undertake the placement* of R.S. at the Alpine School effective [1 March 1996], and will assume responsibility for transporting R.S. to school effective [4 March 1996].

B. R.S. shall attend the Bayonne Autism Program effective, on or about [1 September 1996], *subject to the following:*

1. The parents, the classroom teacher, and other staff involved with the home program will meet bi-weekly between the hours of 2:00 and 3:00 P.M. to review progress and revise the program as needed.

2. The parents will receive daily progress reports which will include discrete trial programming scores and other relevant information.

3. A doctorate level consultant with an expertise in autism and applied behavioral analysis will be available on an as-needed basis by telephone to staff and to parents. The consultant will attend one of the bi-weekly meetings with the teacher and parent each month to review R.S.'s overall progress and to make suggestions for program modifications as needed.

4. The classroom teacher and R.S.'s aides will consult daily about his program.

5. All staff who work with R.S., including aides and therapists, will be appropriately trained in the education of children with autism. Training will include the subjects of applied behavioral analysis and discrete trial teaching.

---

1. The Bayonne Board has submitted: Brief In Support Of Plaintiff's Motion For Summary Judgment (the "Bayonne Board Moving Brief"), incorporating a statement of material facts that are not in dispute, pursuant to Rule 12G of the General Rules for the District of New Jersey (the "Bayonne Board 12G Statement"), and attaching exhibits; Letter of James L. Plosia, Jr., dated 21 November 1996 (the "Reply").

R.S. has submitted: Brief in Support of Defendant's Motion for Summary Judgment (the "R.S. Moving Brief").

6. There will be an open-door policy to permit unscheduled observations. Efforts will be made to help ensure that these observations are unobtrusive. The parents will have access to data concerning R.S. during observations.

7. Instructional methods shall be consistent across instructional settings, including home, school, and on field trips.

8. It is also recognized that the parents are supplementing R.S.'s school program at home in order to promote generalization outside of school. The parents will continue to provide this instruction at their expense. Given R.S.'s unique circumstances and the fact that he is transitioning back to Bayonne from Alpine in September of 1996, the district will provide a home program to complement this effort....

9. R.S. will be placed in a class only with other children who are preschool handicapped and who are either autistic or PDD....

10. The class will have a teacher and at least one aide per child and there will be a floating aide for the program so that discrete trial teaching will be administered to R.S. on a 1:1 basis.

11. Class size shall not exceed 5 pupils, including R.S.

12. The district will make reasonable efforts to ensure that the physical layout of the Bayonne classroom will be free of distractions and noise to facilitate administration of discrete trial teaching and individual therapy. A separate location for therapy will be provided if necessary to accomplish the foregoing.

13. The number and type of individual skill acquisitions problems shall be comparable to those used by R.S. during his final month at the Alpine School. Each program will be taught and charted daily.

14. A transition plan will be developed to offset possible regression when R.S. transfers from Alpine to Bayonne. During Bayonne's summer program R.S. will spend one day a week in the Bayonne [P]rogram working on a program comparable to that provided at Alpine. In conjunction with the transition plan, items 2, 3, 5, 6, 9, 10, 11, 12 and 13 will be implemented at the start of the transition period, and with regard to item 8, staff will initiate the home program at this time. R.S. will attend the Bayonne class on either Wednesdays or Fridays.

Complaint, Exhibit A (the "Settlement Agreement").

### 2. *The Dispute*

The instant dispute involves the implementation of the transition plan (the "Transition Plan"), required by the Settlement. R.S. argues the Bayonne Board "failed to fulfill the terms of the [Settlement]." R.S. Moving Brief at 3.

During July of 1996, R.S. attended the Bayonne Program on four days, one day per week, as called for in the Settlement. Bayonne Board 12G Statement, ¶ 10. R.S.'s mother attended all four days; R.S.'s father attended one day. *Id.,* ¶ 11. Both the Bayonne Program and the Alpine School were closed for summer recess after the first week in August. *Id.,* ¶ 13.

On 14 August 1996, R.S.'s parents notified the Bayonne Board they were not satisfied with the execution of the Transition Plan. They specifically asserted "the [T]ransition [P]lan was never prepared nor implemented. [The] Bayonne staff had nothing prepared for [R.S.] and he attended what amounted to a custodial program. And, when the Alpine staff visited on [31 July 1996] at the request of Bayonne, they were told by the teacher that she was not prepared to meet with them because she had not yet developed a program for [R.S.].... [R.S.'s parents] have not been provided with any of the reports or other information set out in paragraph 2" of the Settlement. Complaint, Exhibit C (letter of Herbert D. Hinkle, dated 14 August 1996). R.S.'s parents requested the Bayonne Board continue R.S.'s placement at the Alpine School. *Id.*

On 29 August 1996, the Bayonne Board denied the request that R.S.'s placement at Alpine School be continued. Complaint, Exhibit B (letter of James L. Plosia, Jr., dated 29 August 1996). That same day, R.S.'s parents wrote the Division of Special Education asserting the Bayonne Board was in violation

of the terms of the Settlement and that a "change in placement from Alpine to Bayonne would deny [R.S.] an appropriate education...." *Id.*, Exhibit D, (letter of Herbert D. Hinkle, dated 29 August 1996).

Subsequently, mediation of the dispute regarding R.S.'s placement was scheduled on 1 October 1996. Bayonne Board 12G Statement, ¶ 19. On 11 September 1996, notwithstanding the scheduled mediation, the Bayonne Board made a motion for emergent relief (the "Bayonne Board Motion for Emergent Relief") with the Division of Special Education, seeking enforcement of the Settlement. *Id.*, ¶ 20. On 13 September 1996, R.S.'s parents, on behalf of R.S., also made a motion for emergent relief (the "Stay Put Motion") asking that the Bayonne Board be compelled to pay for R.S.'s tuition at and provide transportation to the Alpine School, pending resolution of the 29 August 1996 Petition. Bayonne Board 12G Statement, ¶ 21.

The Bayonne Board Motion for Emergent Relief was rejected by the New Jersey Department of Education (the "Department of Education") because it failed to "[m]eet the substantive requirements of N.J.A.C. 6:28." *See* Complaint, Exhibit H (letter of Phyllis DeLucia, Mediator, Department of Education, dated 16 September 1996). The Stay Put Motion was forwarded to the New Jersey Office of Administrative Law for a hearing. Bayonne Board 12G Statement, ¶ 23.

### 3. *The ALJ Hayden Decision*

On 30 September 1996, a hearing was held before ALJ Hayden on the merits of the Stay Put Motion. 12G Statement, ¶ 24. On 10 October 1996, the ALJ Hayden Decision was issued; ALJ Hayden held the Bayonne Board was required to "continue to be responsible for the payment of the tuition for R.S.'s continued attendance at the Alpine School until a decision in this due process hearing [ (the "Second Due Process Proceedings") ]." ALJ Hayden Decision at 6.

ALJ Hayden reasoned:

In this case, [the Bayonne Board] had undertaken to provide *placement* at Alpine with an agreement for very specific events to occur during a transition period so that R.S.'s education may begin in the Bayonne district. Before the placement in Bayonne district occurred, the parents raised the issue of the dissatisfaction with the transition and invoked their right to have a due process proceeding. Thus, *the operative placement under which ... [R.S.] was receiving instruction at the time the dispute arose was the placement at Alpine.* Only in Alpine will the requisite stability and continuity be maintained while the actual placement is being determined in the due process proceeding.

[The Bayonne Board] argued that the [Settlement] committed the respondent to pay for Alpine for a flat six months and the *quid pro quo* was a guaranteed return in September to Bayonne.... However, the [Settlement] is not as simple as [the Bayonne Board] contends.... While the [Bayonne Board] agreed to take over paying for Alpine from March 1, the agreement for the child to go to the Bayonne district was subject to fourteen different items, the completion of which is hotly in dispute.

ALJ Hayden Decision at 5–6 (emphasis added).

### 4. *The Complaint*

As indicated, the Bayonne Board appeals the ALJ Hayden Decision arguing ALJ Hayden "erred in ordering the [Bayonne Board] pursuant to the 'stay put' provision of federal law, to pay for R.S.'s education in and transportation to the Alpine School pending resolution of R.S.'s Due Process Petition." Complaint, ¶ 29.

The Bayonne Board seeks a judgment "reversing the ... decision of ALJ Hayden." Complaint at 10–11. The Bayonne Board also seeks attorney fees and costs in litigating this matter. *Id.*

### *Discussion*

#### A. *Standard of Review*

#### 1. *IDEA Analysis*

■ In a judicial review proceeding under the Individuals with Disabilities Education Act (the "IDEA" or the "Act"), a district court does not use the substantial evidence

standard typically applied in review of administrative agency decisions, but instead must decide independently whether requirements of the IDEA are met. *Susan N. v. Wilson Sch. Dis't,* 70 F.3d 751, 757 (3d Cir. 1995). The IDEA grants the right to a limited judicial review of the administrative proceedings below:

> In any action brought under this paragraph the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

20 U.S.C. § 1415(e)(2) ("Section 1415(e)(2)").[2]

Although a district court enjoys the discretion to consider "additional evidence," the Circuit has emphasized that a district court "must not allow 'such evidence to change the character of the hearing from one of review to a trial *de novo.*'" *Bernardsville Bd. of Ed. v. J.H.,* 42 F.3d 149, 161 (3d Cir.1994) (citation omitted). The primary focus is on the administrative record. *See Board of Ed. v. Rowley,* 458 U.S. 176, 206–07, 102 S.Ct. 3034, 3050–51, 73 L.Ed.2d 690 (1982). "The fact that [20 U.S.C.] § 1415(e) requires that the reviewing court 'receive the records of the [State] administrative proceedings' carries with it the implied requirement that *due weight* shall be given to those proceedings." *Id.* at 206, 102 S.Ct. at 3051.

In *Rowley,* the Court held that judicial review of State IDEA proceedings should focus on two questions. First, a court must ask whether the State complied with the procedural requirements of the Act. Second, it must ask whether the State's determinations are "reasonably calculated" to enable the subject of the proceeding to receive educational benefits. *Rowley,* 458 U.S. at 207, 102 S.Ct. at 3051. The required focus on review has two benefits. First, it properly recognizes Article III judges rarely have the educational expertise to arrive at a better result than the administrative process. *Id.* at 206, 102 S.Ct. at 3050–51 ("[T]he provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review."). Second, it prevents the judiciary from imposing more requirements on the administrative process than Congress has contemplated. *See id.* at 207, 102 S.Ct. at 3051 ("If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.").

### 2. Standard for Summary Judgment

As indicated, the parties have moved for summary judgment, pursuant to Fed. R.Civ.P. 56(c). To prevail on a motion for summary judgment, the moving party must establish "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Orson, Inc. v. Miramax Film Corp.,* 79 F.3d 1358, 1366 (3d Cir.1996); *Witco Corp. v. Beekhuis,* 38 F.3d 682, 686 (3d Cir. 1994). A district court, however, may not resolve factual disputes on a motion for summary judgment. *Linan–Faye Constr. Co. v. Housing Auth.,* 49 F.3d 915, 926–27 (3d Cir. 1995) ("at the summary judgment stage, 'the

---

2. Section 1415(e)(2) provides:

    Any party aggrieved by the findings and decision made under subsection (b) of this section who does not have the right to an appeal under subsection (c) of this section, and any party aggrieved by the findings and decision under subsection (c) of this section, shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought ... in a district court of the United States without regard to the amount in controversy. In any action brought under this paragraph the court shall receive the records of the administrative

proceedings, shall hear additional evidence at the request of a party, and, basing its decision on *the preponderance of the evidence,* shall grant such relief as the court determines is appropriate.

*Id.* (emphasis added). Because the hearings on the Stay Put Motion were held by the New Jersey Office of Administrative Law and not a "local educational agency or an intermediate educational agency" it appears the Bayonne Board did not have a right of appeal under 20 U.S.C. § 1415(c) and the instant matter is properly before the court. *See id.*

judge's function is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial' ") (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986)); *Desvi, Inc. v. Continental Ins. Co.,* 968 F.2d 307, 308 (3d Cir.1992).

In considering a motion for summary judgment, all evidence submitted must be viewed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Healey v. Southwood Psychiatric Hosp.,* 78 F.3d 128, 130–31 (3d Cir.1996); *General Ceramics Inc. v. Firemen's Fund Ins. Cos.,* 66 F.3d 647, 651 (3d Cir.1995); *Meyer v. Riegel Products Corp.,* 720 F.2d 303, 307 n. 2 (3d Cir.1983) (the court must resolve "all inferences, doubts and issues of credibility ... against the moving party"), *cert. dismissed,* 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984).

When the resolution of issues depends wholly upon the interpretation of specific statutory language and the applicable law, summary judgment is appropriate. *See DiBiase v. SmithKline Beecham Corp.,* 48 F.3d 719, 724 (3d Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 306, 133 L.Ed.2d 210 (1995); *see also Gans v. Mundy,* 762 F.2d 338, 341 (3d Cir.) ("summary judgment is proper where the facts are undisputed"), *cert. denied,* 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985); *Estate of Reddert v. United States,* 925 F.Supp. 261, 265 (D.N.J.1996).

In addition, when the nonmoving party bears the burden of proof at trial, the moving party is entitled to summary judgment by showing "there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2554. Once the movant demonstrates an essential element of the nonmovant's case is lacking, the nonmovant must come forward with sufficient evidence to demonstrate there is a factual controversy as to that element. *Anderson,* 477 U.S. at 247, 106 S.Ct. at 2509–10; *Siegel Transfer, Inc. v. Carrier Exp., Inc.,* 54 F.3d 1125, 1130–31 (3d Cir.1995); *Witco,* 38 F.3d at 686. "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512; *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1355–56 (nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts"); *accord Siegel,* 54 F.3d at 1130–31; *Nevets C.M., Inc. v. Nissho Iwai Am. Corp.,* 726 F.Supp. 525, 534 (D.N.J.1989), *aff'd without op'n,* 899 F.2d 1218 (3d Cir.1990).

If the nonmovant fails to make a sufficient showing regarding an essential element of its case upon which it will bear the ultimate burden of proof at trial, all other facts are necessarily immaterial and summary judgment must be granted. *Celotex,* 477 U.S. at 321, 106 S.Ct. at 2551–52; *Siegel,* 54 F.3d at 1130–31; *see also Armstrong v. City of Dallas,* 997 F.2d 62, 67 (5th Cir.1993) ("[s]ummary judgment is appropriate where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or where it is so overwhelming that it mandates judgment in favor of the movant").

In the instant case, the parties are in agreement there are "no facts in dispute for purposes of adjudicating the cross-motions." Bayonne Board Moving Brief at 3 n. 1; R.S. Moving Brief at 3.

*The IDEA*

The IDEA was passed " 'to assure that all children with disabilities would have available to them ... a free appropriate public education which emphasizes special education and related services designed to meet their unique needs.' " 20 U.S.C. § 1400(c).

The IDEA defines "disability" broadly to include children "with mental retardation, hearing impairments, visual impairments including blindness, serious emotional disturbance, orthopedic impairments, *autism,* traumatic brain injury, other health impairments, or specific learning disabilities...." 20 U.S.C. § 1401(a)(1)(A) (emphasis added).

The IDEA requires participating State and local educational agencies "to assure that handicapped children and their parents

or guardians are guaranteed procedural safeguards with respect to the provision of free appropriate public education." 20 U.S.C. § 1415(a). "These procedures include the right of the parents to participate in the development of an 'individualized education program' (["IEP"]) for the child and to challenge in administrative and court proceedings a proposed IEP with which they disagree." *Burlington School Comm. v. Massachusetts Dep't of Ed.*, 471 U.S. 359, 361, 105 S.Ct. 1996, 1998, 85 L.Ed.2d 385 (1985) (citing 20 U.S.C. §§ 1401(19), 1415(b), (d)–(e)); *see Susan N.*, 70 F.3d at 756. The IDEA is

> to assure that all handicapped children have available to them . . . a free appropriate public education which emphasizes special education and related services designed to meet their unique needs [and] to assure that the rights of handicapped children and their parents or guardians are protected.

20 U.S.C. § 1400(c). The IDEA defines a "free appropriate public education" to mean

> special education and related services which (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary, or secondary school education in the State involved, and (D) are provided in conformity with [an] individualized education program.

20 U.S.C. § 1401(18).

Congress has incorporated an "elaborate set of what it labeled 'procedural safeguards' to insure the full participation of the parents and proper resolution of substantive disagreements." *Burlington School*, 471 U.S. at 368, 105 S.Ct. at 2002. Among these "procedural safeguards" are the right to "impartial due process hearing" and for "judicial review in [S]tate or [F]ederal court to '[a]ny party aggrieved by the findings and decision' made after the due process hearing." *Id.* at 369, 105 S.Ct. at 2002; *see Susan N.*, 70 F.3d at 756; *W.B. v. Matula*, 67 F.3d 484, 492 (3d Cir.1995); *Bernardsville Bd. of Ed. v. J.H.*, 42 F.3d 149, 158 & n. 13 (3d Cir.1994); *Lester H. v. Gilhool*, 916 F.2d 865, 869 (3d

Cir.1990), *cert. denied*, 499 U.S. 923, 111 S.Ct. 1317, 113 L.Ed.2d 250 (1991). As indicated, the court conducting this review may hear additional evidence at the request of a party and "basing its decision on the preponderance of the evidence, shall grant such relief as the court determines appropriate." 20 U.S.C. § 1415(e)(2).

One of the IDEA's important procedural safeguards is its " 'pendant placement' or 'stay put' provision." *Susquenita Sch. Dis't v. Raelee S.*, 96 F.3d 78, 82 (3d Cir.1996). The IDEA provides:

> During the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents or guardian otherwise agree, the child shall remain in the *then current educational placement* of such child, or, if applying for initial admission to a public school, shall, with the consent of the parents or guardian, be placed in the public school program until all such proceedings have been completed.

20 U.S.C. § 1415(e)(3)(A). The Circuit has recognized the policy concerns underlying the "pendant placement" or "stay put provision":

> The provision represents Congress' policy choice that all handicapped children, regardless of whether their case is meritorious or not, are to remain in their current educational placement until the dispute with regard to their placement is ultimately resolved.

*Drinker by Drinker v. Colonial School Dist.*, 78 F.3d 859, 864–65 (3rd Cir.1996).

"[P]arents who unilaterally change their child's placement during the pendency of review proceedings, without the consent of [S]tate or local school officials, [however,] do so at their own financial risk. If the courts ultimately determine that the IEP proposed by the school officials was appropriate, the parents would be barred from obtaining reimbursement for any interim period in which their child's placement violated [20 U.S.C.] § 1415(e)(3)." *Burlington School*, 471 U.S. at 373–74, 105 S.Ct. at 2004.

The child's "current educational placement" is the IEP " 'actually functioning when

the "stay put" is invoked.'" *Raelee S.,* 96 F.3d at 83 (citing *Drinker,* 78 F.3d at 867 (quoting *Woods v. New Jersey Dep't of Educ.,* No. 93–5123, 20 Indiv. Disabilities Educ.L.Rep. (LRP Publication) 439, 440 (3d Cir. 17 September 1993))).

B. *Review of the ALJ Hayden Decision*

The instant case presents two issues. First, whether, on 29 August 1996, the Alpine School was R.S.'s "then current" placement for purposes of the IDEA's "stay put" provision. Second, the identification of who should pay for R.S.'s tuition during the pendency of the Second Due Process Proceedings. *See Drinker,* 78 F.3d at 865 (citing *Woods,* 20 Indiv. Disabilities Educ.L.Rep. at 440; *Zvi D. by Shirley D. v. Ambach,* 694 F.2d 904, 906 (2nd Cir.1982)).

■ The Bayonne Board argues that, as of 29 August 1996, "R.S. had been *'disenrolled'* from [the Alpine School] for some three weeks, and was one week away from beginning school in Bayonne...." Bayonne Board Moving Brief at 14. The Bayonne Board argues, therefore, R.S.'s "then current" placement was the Bayonne Program, not the Alpine School. *Id.*

As indicated, R.S.'s "current educational placement" is the school in which his IEP was "actually functioning" when the "stay put" provision of the IDEA was invoked. *Raelee S.,* 96 F.3d at 83 (citing *Drinker,* 78 F.3d at 867 (quoting *Woods,* 20 Indiv. Disabilities Educ.L.Rep. at 440)). The purpose of the IDEA's "stay put" provision is to preserve the "status quo" and, thereby, to "protect handicapped children and their parents during the review process." *Id.* at 82.

On 29 August 1996, by the terms of the Settlement, R.S. had not yet been placed in the Bayonne Program. As indicated, the Settlement provided that R.S. would attend the Bayonne Program commencing on 1 September 1996. Accordingly, the Alpine School was the "then current" placement of R.S. for purposes of the IDEA's "stay put" provision.

The Bayonne Board's argument that the Bayonne Program is the appropriate place-

ment is rejected. As indicated, the purpose of the IDEA "stay put" provision is to "maintain the status quo" and to protect the child. Requiring R.S. to attend the Bayonne Program would be contrary to this goal; requiring R.S. to attend a new program, during the pendency of the Second Due Process Proceedings, would not maintain the "status quo" of his educational placement. This is especially so in the instant case because the capability of the Bayonne Program to address the educational needs of R.S. is in dispute.

The Bayonne Board argues the "ramifications" of holding the Alpine School to be the "then current placement," based upon the Settlement, would be dire:

> Let us assume that the parents of a special education child wish to gain the benefits of the stay put provisions of [F]ederal law in order to compel a school district to pay for a private school placement. They cannot do so at the present time, though because they have unilaterally placed their child in a private placement. All the parents need to do (if [ALJ] Hayden is correct in her decision), is enter into a settlement agreement in which the district agrees to pay for the child to remain in private placement *for a limited period of time.*
>
> Once the settlement is entered into and after the district has paid for the private placement to the end of the school year, our hypothetical parents simply file another Due Process claim, asserting that the settlement is void or that they no longer believe the public school placement is appropriate. They then move for the protection of a "stay put." If [ALJ] Hayden is correct, the parents in this hypothetical are entitled to the protection of "stay put" while the parents litigate *to conclusion* (which may of course include an appeal of a final administrative decision to federal court) their Due Process claim.

Bayonne Board Moving Brief at 17–18 (emphasis in original). The Bayonne Board argues this would encourage bad faith actions on the part of parents of handicapped children.[3] *Id.* at 18.

---

3. The Bayonne Board, although admitting it has

"no proof," impliedly asserts the decision not to

The argument by the Bayonne Board that the ALJ Hayden Decision will encourage bad faith on the part of parents, who would be able "to get the benefit of [a] stay put [order] ... simply by settling the[ir] case," Bayonne Moving Brief at 18, is not persuasive. The potential for abuse of such settlement agreements may easily be addressed in such agreements.

In the instant case, the Settlement provided for the "*placement* of R.S. at the Alpine School effective [1 March 1996]." Settlement, ¶ A (emphasis added). The Settlement further provided that, starting in September 1996, R.S. would attend the Bayonne Program "*subject to*" fourteen specific conditions. *Id.*, ¶ B (emphasis added).

Significantly, the Settlement provided for "placement" at the Alpine School. This distinguishes the instant case from *Zvi D.*, 694 F.2d 904, upon which the Bayonne Board relies.

In *Zvi D.*, a handicapped student was enrolled in a private school by his parent. 694 F.2d at 907. After enrolling the child, the parent requested an evaluation "by the District 20 Subcommittee of the New York City Board of Education's Committee on the Handicapped [ ("COH") ]," to determine whether the child was eligible to receive public funding for his private schooling. *Id.* The COH recommended "free appropriate public education placement." *Id.* at 907. The child's parent contested the COH recommendation and "[b]efore the appropriateness of the COH recommendation could be reviewed, the Board of Education essentially agreed to postpone the initial evaluation until May 1979 and fund [the child at the private school] for the 1978–79 school year only." *Id.* The agreement in *Zvi D.* further provided that the " 'funding is being provided with the stipulation that a review of [the child's]

classification [would] be conducted a the end of the ... year with a view toward placing him in an appropriate public program in September, 1979.' " *Id.*

Significantly, the child in *Zvi D.* was never placed in the private school—the Board of Education merely agreed to pay for his tuition until the review of his classification could be conducted. 694 F.2d at 907. In the instant case, the Bayonne Board agreed to the placement of R.S. at the Alpine School; it did not merely agree to pay for R.S.'s tuition until the transition to the Bayonne Program was complete. *See id.* at 908 ("Payment and placement are two different matters.").

As indicated, despite its argument to the contrary, the Bayonne Board did not specifically limit the duration of R.S.'s placement at the Alpine School until September 1996. The Settlement made attendance by R.S. at the Bayonne Program "subject to" fourteen specific conditions. Settlement, ¶ B. As ALJ Hayden observed, whether these conditions have been met is "hotly in dispute." ALJ Hayden Decision at 3.

The Settlement, moreover, did not provide for an interim placement in the event a problem with the transition to the Bayonne Program were to arise. *See Woods*, 20 Indiv. Disabilities Educ.L.Rep. 439, at WESTLAW *4. In Woods, the Circuit, faced with a similar settlement agreement, held:

> The settlement agreement ... does not refer to the "stay put" or clearly describe any limits on it. The agreement does not contain a statement that [the private school] would not become [the student's] "then current educational placement" for the "stay put." Neither does the agreement contain any provision, as it might have, in which the parties agree to an interim placement for [the student] in the event there is a dispute over (1) her classi-

---

enroll R.S. in the Bayonne Program was made in bad faith:

> [The Bayonne Board] has no proof (at least at the present time) that [the parents of R.S.] engaged in the type of conduct described in the hypothetical. However, the fact that R.S. was able to keep his placement at [the Alpine School] as of September, despite the fact that the [s]chool has a long waiting list for vacancies, is strong evidence that there never was a

vacancy for R.S.'s spot because the parents never intended to remove R.S. from Alpine and place him in [the Bayonne Program].

Bayonne Moving Brief at 18 n. 5. The fact R.S. was able to return to the Alpine School does not appear to be "strong evidence" of bad faith on the part of his parents. As the Bayonne Board concedes it has no proof the parents of R.S. were acting in bad faith; the Bayonne Board merely speculates as to their motives.

fication; (2) the program; or (3) what constitutes an appropriate day placement. In short, the underlying merits are still at issue, and we find that the plain language of the settlement agreement evidences no effective waiver of the "stay put" provision, or any limitation on its applicability for the purposes of [an] appeal of the ... placement. . . .

*Woods,* 20 Indiv. Disabilities Educ.L.Rep. 439, at WESTLAW *4.[4]

When the Bayonne Board agreed to placement at the Alpine School, the Alpine School became the appropriate pendant placement for purposes of the IDEA's "stay put" provision. *See Raelee S.,* 96 F.3d at 83; *Woods,* 20 Indiv. Disabilities Educ.L.Rep. 439., at WESTLAW *3. The Bayonne Board is accordingly responsible for tuition and expenses associated with the placement of R.S. at the Alpine School, pending the conclusion of the Second Due Process Proceedings. *See Burlington School,* 471 U.S. at 372, 105 S.Ct. at 2003–04; *Raelee S.,* 96 F.3d at 84; *Drinker,* 78 F.3d at 867.

### C. *Attorney Fees*

R.S. has moved for attorney fees, pursuant to 20 U.S.C. § 1415(e)(4)(B) ("Section 1415(e)(4)(B)"). Section 1415(e)(4)(B) provides:

> In any action or proceeding brought under this subsection, the court, in its discretion, may award reasonable attorneys' fees as part of the costs to the parents or guardian of a child or youth with a disability who is the prevailing party.

*Id.*

The standard for determining whether a party has prevailed is well settled. "A prevailing party must succeed on 'any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.'" *Wheeler v. Towanda Area Sch. Dis't,* 950 F.2d 128, 131 (3d Cir.1991) (quoting *Hensley v. Eckerhart,* 461 U.S. 424, 434, 103 S.Ct. 1933, 1939–40, 76 L.Ed.2d 40 (1983) (quoting *Nadeau v. Helgemoe,* 581 F.2d 275, 278–79

(1st Cir.1978))). The Circuit has established a "two-part test:" (1) whether the litigant has achieved relief, and (2) whether there is a causal connection between the litigation and the relief achieved. *Id.* (citing *Institutionalized Juveniles v. Secretary of Pub. Welfare,* 758 F.2d 897, 910 (3d Cir.1985)).

The Circuit has "articulated a liberal standard for that comparison: as long as a [litigant] achieves some of the benefit sought in a lawsuit, even though the [litigant] does not ultimately succeed in securing a favorable judgment, the [litigant] can be considered the prevailing party for purposes of a fee award." *Wheeler,* 950 F.2d at 131 (citing *NAACP v. Wilmington Medical Ctr., Inc.,* 689 F.2d 1161, 1166 (3d Cir.1982), *cert. denied,* 460 U.S. 1052, 103 S.Ct. 1499, 75 L.Ed.2d 930 (1983)).

■ Litigation is causally related to the relief obtained if it was a material contributing factor in bringing about the events that resulted in obtaining the desired relief. *Institutionalized Juveniles,* 758 F.2d at 916. Litigation can be a material contributing factor if it changed the legal relations of the parties such that defendants were legally compelled to grant relief. *Wheeler,* 950 F.2d at 132.

■ In the instant action, R.S. is the "prevailing party." Whether the Bayonne Program is ultimately determined to be the appropriate placement for R.S. is immaterial to the current application for attorney fees. *Wheeler,* 950 F.2d at 131. As indicated, R.S. initially requested that the Bayonne Board continue the placement at the Alpine School. When the Bayonne Board refused, R.S. filed the Stay Put Motion. As indicated, the Bayonne Board was ordered to pay the tuition and costs associated with the placement of R.S. at the Alpine School. ALJ Hayden Decision at 6. Instead of moving forward with the Second Due Process Proceedings, the Bayonne Board choose to bring the instant action, which is limited to an appeal of the ALJ Hayden Decision.

---

**4.** Because the opinion in *Woods* is unpublished, it is not regarded as binding authority. *Drinker,* 78 F.3d at 864 n. 12. Because of the similarity between *Woods* and the instant action, however,

"we [are able] to look to the decision as a paradigm of the legal analysis that we should here follow." *Id.*

R.S. has prevailed in the instant action; accordingly reasonable attorney fees, limited to those incurred in obtaining the "stay put" protection, are appropriate.[5]

*Conclusion*

For the reasons stated, the Bayonne Board Motion for Summary Judgment is denied and the R.S. Motion for Summary Judgment is granted.

---

**5.** The Bayonne Board has failed to respond to the R.S. argument that attorney fees should be awarded. *See* Reply.