**ESCAMBIA COUNTY BOARD OF EDUCATION, Appellant,**

v.

**Jarred BENTON, Appellee.**

**No.  CIV.A.05–0009–WS–B.**

United States District Court,
S.D. Alabama,
Southern Division.

Feb. 25, 2005.

Broox G. Garrett, Jr., Brewton, AL, Susan Williams Reeves, Birmingham, AL, for Plaintiff.

James D. Sears, Sears & Algood, LLC, Daphne, AL, for Defendant.

## ·ORDER

STEELE, District Judge.

This matter is before the Court on appellant Escambia County Board of Education's Motion to Remand (doc. 3) and its Motion for Stay of Administrative Due Process Hearing Proceedings (doc. 6). Both Motions have been briefed and are ripe for disposition.

## I. Background.

This action arises pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 et seq. (the "IDEA").[1] The stated purpose of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A). To that end, the IDEA requires schools to assemble a team to evaluate each child with a disability and to develop and implement an individualized education program ("IEP") for that student. See Ortega v. Bibb County School Dist., 397 F.3d 1321, 1323–24 (11th Cir. 2005). The IEP must be reviewed periodically, but no less than annually, by the IEP team to determine whether the student is achieving annual goals. See id.

The pleadings reflect that Jarred Benton ("Benton") is an eleven-year old student at W.S. Neal Elementary School, an educational institution within the school system administered by the Escambia County Board of Education (the "Board"). The singular issue at the core of this dispute is whether the Board has provided Benton, who has been diagnosed with autism spectrum disorder, with a free, appropriate public education conforming to the IDEA.

On March 11, 2004, Benton initiated the underlying administrative proceedings by requesting an impartial due process hearing from the Alabama Department of Education. (Motion to Remand (doc. 3), at

Exh. A.) In making this request, Benton asserted that the Board had failed appropriately to evaluate and identify him as a student with a disability, had failed to prepare an appropriate IEP, and had failed to provide appropriately trained personnel to formulate and implement behavior management strategies for him. (Id.) Benton's principal dissatisfaction with the existing IEP appeared to be its failure to establish a behavior intervention plan or otherwise to address his behavioral needs.

Over the course of three days in the summer and fall of 2004, a due process hearing was conducted before Hearing Officer Wesley Romine. (Id. at Exh. B.) On or about November 8, 2004, the Hearing Officer issued a Due Process Decision (the "Administrative Decision") largely adverse to the Board. The Hearing Officer concluded that the Board had violated Benton's right to a free, appropriate public education under the IDEA by: (i) writing an improper IEP for him for the 2002–03 and 2003–04 school years; and (ii) failing to conduct a functional behavior assessment and either to draft and implement an appropriate behavior intervention plan or to revise Benton's IEPs to address his autistic behavior. (Id.)[2] The Administrative Decision directed the Board to prepare a functional behavior assessment for Benton within 30 days, and to cause a meeting of his IEP team to develop a behavior modification plan within the same time frame. (Id.) To date, the Board has failed to comply with these specific directives.

The Administrative Decision indicated that any party dissatisfied thereby must

---

1. On December 3, 2004, President Bush signed into law the Individuals with Disabilities Education Improvement Act of 2004, Pub.L. No. 108–446. Because this amendment does not take effect until July 1, 2005, the Court need not consider herein its impact, if any, on the legal issues presented.

2. Despite these facets, the Administrative Decision was not uniformly unfavorable to the Board. Rather, the Hearing Officer concluded that "[t]he training of the school system personnel was adequate for purposes of the academic instruction of this autistic child," rejecting Benton's claim to the contrary. (Id. at 28.)

file a notice of intent to file civil action within 30 days, and must proceed actually to file such civil action within 30 days after filing such a notice. (*Id.* at 28–29.)[3] The Board complied with both requirements by giving notice on December 6, 2004, then filing a one-paragraph pleading designated as a "Notice of Appeal" in the Circuit Court of Escambia County, Alabama, on January 3, 2005. (Notice of Removal (doc. 1), at Exh. A.)[4]

Barely a week later, Benton removed the Escambia County action to this District Court, asserting that federal subject matter jurisdiction was conferred by the federal question provisions of 28 U.S.C. § 1331. Shortly thereafter, on January 25, 2005, Benton petitioned the Alabama Department of Education for another due process hearing, this time on the ground that the Board had "fail[ed] to implement the provisions of the due process hearing officer's decision" that lies at the heart of this action. (Motion for Stay (doc. 6), at Exh. 1.)[5] Benton's request included a demand that this latest matter be heard by a

hearing officer and that a decision be rendered within 45 days. (*Id.*) Two days later, on January 27, 2005, the parties were notified that P. Michael Cole had been appointed hearing officer in that matter.

In response to these developments, the Board filed two Motions in this action. The first, a Motion to Remand, petitions the Court to send this action back to state court on the ground that Benton lacked the legal status to remove it. The second, a Motion to Stay, requests that this Court enter an order staying the administrative proceedings initiated by Benton on January 25, 2005, on the ground that the relief requested in those proceedings is coextensive with the subject matter of the instant appeal and violates the IDEA's "stay put" provision.[6]

## II. Motion to Remand.

### A. Legal Standard.

A removing defendant bears the burden of establishing the propriety of removal under 28 U.S.C. § 1441 and, therefore, of establishing the existence of

---

3. This guidance was consistent with the IDEA, which provides that any "party aggrieved" by an administrative decision "shall have the right to bring a civil action with respect to the complaint presented pursuant to this section." 20 U.S.C. § 1415(i)(2)(A).

4. The Escambia County action was captioned *Escambia County Board of Education v. Jarred Benton,* Case # CV 05–02. The Notice of Appeal designated the Board as "Appellant" and Benton as "Appellee." The caption of this Order adopts those labels; however, the Court recognizes that the proper nomenclature for the parties is a point of significant discord. Additionally, the Court notes that in recent filings, the Board has omitted Benton's name from the caption and has instead referred to him as "J.B." Benton's pleadings continue to recite his name in full. Unless and until the Court receives and rules on an appropriate motion (assuming the parties wish to do so) to alter it, the official caption of this matter is that referenced in this Order.

5. The January 25 request for due process hearing repeatedly referenced the "Baldwin County Board of Education" as the entity that allegedly violated Benton's right to a free, appropriate public education. (*Id.*) The Court assumes that such references were in error, and that Benton's counsel intended to identify the Escambia County Board of Education as the purported wrongdoer.

6. In briefing these Motions, the parties have cluttered the record with redundant filings of various exhibits. Indeed, the record now contains multiple copies of, among other things, Benton's March 2004 request for administrative hearing, the November 2004 Administrative Decision, and the Board's notice of appeal. It benefits neither the Court nor the litigants for the record to boast three identical copies of a 29–page Administrative Decision. The parties should take appropriate precautions to avoid unnecessary duplication of exhibits henceforth.

federal jurisdiction. *Leonard v. Enterprise Rent a Car,* 279 F.3d 967, 972 (11th Cir.2002) ("A removing defendant bears the burden of proving proper federal jurisdiction."); *Tapscott v. MS Dealer Service Corp.,* 77 F.3d 1353, 1356 (11th Cir.1996), *overruled on other grounds by Cohen v. Office Depot, Inc.,* 204 F.3d 1069 (11th Cir.2000). Because removal infringes upon state sovereignty and implicates central concepts of federalism, removal statutes must be construed narrowly, with all doubts resolved in favor of remand. *See Allen v. Christenberry,* 327 F.3d 1290, 1293 (11th Cir.2003); *University of South Alabama v. American Tobacco Co.,* 168 F.3d 405, 411 (11th Cir.1999) (explaining that strict construction of removal statutes derives from "significant federalism concerns" raised by removal jurisdiction); *Whitt v. Sherman Int'l Corp.,* 147 F.3d 1325, 1333 (11th Cir.1998) (expressing preference for remand where removal jurisdiction is not absolutely clear); *Burns v. Windsor Ins. Co.,* 31 F.3d 1092, 1095 (11th Cir.1994) (removal uncertainties are resolved in favor of remand); *Newman v. Spectrum Stores, Inc.,* 109 F.Supp.2d 1342, 1345 (M.D.Ala.2000) ("Because federal court jurisdiction is limited, the Eleventh Circuit favors remand of removed cases where federal jurisdiction is not absolutely clear.").

### B. Analysis.

■ The law is clear that, as a general rule, "[d]efendants can remove civil actions over which the federal courts would have had original jurisdiction." *Reed v. Heil Co.,* 206 F.3d 1055, 1058 (11th Cir.2000); *see also* 28 U.S.C. § 1441(a) ("any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending"). The Eleventh Circuit has recently recognized the following three prerequisites for removal jurisdiction: (1) the case originated in state court; (2) the defendant removed the case to the proper federal court; and (3) the federal district court had original jurisdiction to entertain the suit. *See Cogdell v. Wyeth,* 366 F.3d 1245, 1248 (11th Cir. 2004). Here, the Board does not challenge either the first or third removal requirements; rather, its sole argument in favor of remand is that Benton is not the "defendant" and therefore could not validly remove this case.

#### 1. Whether Federal Subject Matter Jurisdiction Exists.

Before addressing whether Benton is properly classified as a "defendant," the Court examines whether it has original jurisdiction over this matter.[7] There being no suggestion that jurisdiction here could properly be predicated on diversity of citizenship, federal subject matter jurisdiction must stand or fall based on the existence of federal question jurisdiction, pursuant to 28 U.S.C. § 1331. That determination, in turn, depends on whether ap-

---

7. The Court considers this question even though the parties have not raised it in their briefs. Because the jurisdiction of federal courts is narrowly circumscribed, this Court bears an affirmative duty to inquire *sua sponte* whenever subject matter jurisdiction is in doubt. *See Fitzgerald v. Seaboard Sys. R.R., Inc.,* 760 F.2d 1249, 1251 (11th Cir.1985) ("A federal court not only has the power but also the obligation at any time to inquire into jurisdiction whenever the possibility that jurisdiction does not exist arises."); *Smith v. GTE Corp.,* 236 F.3d 1292, 1299 (11th Cir. 2001) ("[B]ecause a federal court is powerless to act beyond its statutory grant of subject matter jurisdiction, a court must zealously insure that jurisdiction exists over a case, and should itself raise the question of subject matter jurisdiction at any point in the litigation where a doubt about jurisdiction arises.").

peals of administrative decisions in IDEA actions lie within the original jurisdiction of federal district courts.

■ The IDEA itself creates concurrent federal and state jurisdiction by providing that any party aggrieved by an administrative decision "shall have the right to bring a civil action ... in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy." 20 U.S.C. § 1415(i)(2)(A). Under any reasonable interpretation of this language, appeals from IDEA administrative decisions properly present federal questions giving rise to federal subject matter jurisdiction. *See Maroni v. Pemi–Baker Regional School Dist.*, 346 F.3d 247, 258 (1st Cir.2003) (declaring that federal court would have original jurisdiction over IDEA claims); *Ullmo ex rel. Ullmo v. Gilmour Academy*, 273 F.3d 671, 680 (6th Cir.2001) ("Any claim arising under the IDEA is therefore subject to the jurisdiction of the district court" under § 1331, notwithstanding fact that the IDEA gives plaintiff choice of filing in state or federal court); *Linda W. v. Indiana Dept. of Educ.*, 927 F.Supp. 303, 306 (N.D.Ind.1996) (finding that the IDEA explicitly creates federal jurisdiction over claims brought by any party aggrieved by results of administrative proceedings).[8] Thus, the Court finds that this action is one over which it has original jurisdiction, pursuant to 28 U.S.C. § 1331.

*2. Whether Benton is a "Defendant" Entitled to Remove Suit.*

■ The sole basis for the Motion to Remand is the Board's contention that Benton was ineligible to remove this action from state court because he is not a "defendant." As a preliminary matter, the Board is correct that only defendants can remove actions to federal court. *See, e.g.,* 28 U.S.C. § 1441(a) (conferring removal rights upon "the defendant or the defendants"); *Lops v. Lops*, 140 F.3d 927, 965 (11th Cir.1998) (Kravitch, J., dissenting) (observing that "only defendants have the right to remove cases from state to federal court"); *Scott v. Communications Services, Inc.*, 762 F.Supp. 147, 149 (S.D.Tex. 1991) ("Only the defendant can remove a case."). The question, then, is whether Benton is properly classified as a plaintiff (in which case removal is improper) or as a defendant (in which case removal is proper) in this action. Although the parties' briefs bog down in an outcome-driven game of semantics, three distinct lines of reasoning persuade the Court that the latter approach is correct.

First, the Court is persuaded that the Board is the real plaintiff in interest in this lawsuit. Although the parties devote much attention to whether and under what circumstances a school board can seek affirmative relief against a disabled child under the IDEA, the Court does not believe this to be the proper inquiry for removal jurisdiction. Likewise, it is of no consequence for removal purposes that Benton initiated the underlying administrative proceedings. The fact of the matter is that this lawsuit exists only because the Board, as a "party aggrieved" by the Administrative Decision, chose to "bring a civil action" against Benton pursuant to 20

---

**8.** Not surprisingly, federal courts routinely allow removal of IDEA appeals initially filed in state court. *See, e.g., Ullmo*, 273 F.3d at 680 ("the fact that the IDEA provides the plaintiff with the choice of state or federal court does not preclude the removal of the resulting action to federal court"); *Maroni*, 346 F.3d at 258 (indicating that school district would have right to remove IDEA action to federal court); *Yankton Area Adjustment Training Center, Inc. v. Oleson By and Through Oleson*, 897 F.Supp. 431, 432 (D.S.D.1995) (rejecting argument that the IDEA implies a prohibition on removal because it conveys concurrent state and federal jurisdiction).

U.S.C. § 1415(i)(2)(A).[9] Notwithstanding the Board's creative semantics arguments, it is clear to the undersigned that a "party aggrieved" which decides to, and does, "bring a civil action" is necessarily a plaintiff. Stated differently, Benton cannot properly be deemed the plaintiff in this litigation because Benton seeks no relief from this Court and would presumably be equally content (if not more so) if this lawsuit had never been filed. By contrast, the Board is the instigator in this action, the lone party requesting judicial relief in the form of a ruling overturning the unfavorable Administrative Decision. In this regard, the Court agrees with the reasoning of *Yankton Area Adjustment Training Center, Inc. v. Oleson By and Through Oleson*, 897 F.Supp. 431 (D.S.D.1995), in which the court rejected an argument identical to the Board's. The *Yankton* court concluded that because the school "is the 'aggressor' seeking relief from the administrative officer's decision, . . . it is the plaintiff in this civil action," such that the disabled child and his parents could properly remove the appeal from that administrative decision to federal court under the IDEA. *Id.* at 432–33. The same reasoning obtains here.[10]

Second, the Court cannot accept the Board's position because doing so would inject an asymmetry into IDEA civil actions that Congress never intended. Under the Board's reasoning, school systems would typically possess exclusive control over the forum in which an IDEA appeal ultimately resided. If an administrative decision favored the school, and the student appealed to state court, the school could, through exercise of its removal rights, decide whether the case ultimately was heard in state or federal court. If, however, the administrative decision favored the student, and the school chose to appeal to state court, the student would have no corresponding power of removal, but would be stuck in state court.[11] The Board identifies nothing in the text of the IDEA, its legislative history, or the case authorities interpreting it to suggest that Congress desired to give school systems near-absolute authority to decide whether appeals from administrative decisions

**9.** This statutory text allowing any "party aggrieved" to "bring a civil action" thwarts the Board's position that "[t]here is no cause of action whatsoever under IDEA that permits the Board to be the plaintiff." (Board Brief (doc. 4), at 5.) In support of this contention, the Board cites to *E.D. ex rel. Dukes v. Enterprise City Bd. of Educ.*, 273 F.Supp.2d 1252 (M.D.Ala.2003). No jump cite or further detail was provided. The Court has reviewed the lengthy *Dukes* opinion in vain for any holding that might bolster the Board's position that it can never be considered a plaintiff in an IDEA case.

**10.** In fact, this result is dictated by the Board's own argument, which urges this Court to use a "functional test" to identify the "true plaintiff as that party with an interest to achieve a particular result as a product of the removed action." (Board Brief (doc. 4), at 4.) Simply put, Benton has no interest to achieve any particular result as a product of this action. Benton wants nothing from this

Court. It is the Board that seeks to achieve a particular result, to-wit: the reversal of an otherwise-binding Administrative Decision. Likewise, it is Benton who resists the result sought by the Board. Under the "functional test" championed by the Board, there can be no question that Benton is properly classified as the defendant. *See, e.g., OPNAD Fund, Inc. v. Watson*, 863 F.Supp. 328, 334 (S.D.Miss. 1994) ("Under the functional test for party status, . . . a court looks to which party is attempting to achieve a particular result and which party is resisting the other party's claims.").

**11.** Thus, if the law were as the Board urges, the only scenario through which a student could definitively select the forum in which an IDEA appeal were heard would be if both (a) the administrative decision was adverse to the student; and (b) the student chose to appeal to federal court. In all other scenarios, ultimate control over the forum would reside in the hands of the school board.

would be litigated in state or federal courts. The obvious inequities and unprincipled absence of mutuality inherent in such a scheme strongly counsel against its adoption here.

Third, examination of the policies underlying the "defendant" rule for removal militate in favor of the same result. As one court has explained, "[t]he purpose of restricting the right of removal to the defendant is to restrict removal to the party who had no choice in selection of the forum." *Scott,* 762 F.Supp. at 150; *see also Smith v. St. Luke's Hospital,* 480 F.Supp. 58, 61 (D.S.D.1979) ("In restricting removal to defendants, the purpose of 28 U.S.C. § 1441 is to restrict the right of removal to those who had no choice in selection of a forum."). Here, it was the Board that selected a state court forum by filing the lawsuit there; therefore, Benton, as the party who had no choice in selecting that forum, properly is deemed a defendant, with a corresponding right of removal under the concurrent jurisdiction provisions of the IDEA. To hold otherwise would be to subvert the purposes underlying the statute restricting removal to "defendants."

For the foregoing reasons, the Court finds that the Board is properly classified as the plaintiff, and that Benton is properly classified as the defendant, in the in-

stant litigation.[12] In light of Benton's status as a defendant, its removal of this action to federal court was entirely proper. The Board's Motion to Remand is therefore **denied.**[13]

### III. Motion for Stay.

On January 31, 2005, the Board filed a Motion for Stay of Administrative Due Process Hearing Proceedings (doc. 6). Animating this Motion is Benton's initiation of a new round of administrative proceedings on January 25, 2005 (more than three weeks after the Board formally appealed) to enforce the Administrative Decision entered on November 8, 2004. The Board maintains that, in light of the pending appeal, no administrative hearing should be conducted regarding the Board's failure to comply with the Administrative Decision, the validity of which is at issue in this litigation. Citing not a single legal authority, the Board's Motion asserts in conclusory terms that this Court has "jurisdiction to issue a stay until such time as the appeal is resolved." (Motion for Stay, at 3–4.)

#### A. Section 1415(j) of the IDEA.

Subsequent Court-ordered briefing revealed that the Motion for Stay is predicated on the "stay put" provisions of 20 U.S.C. § 1415(j).[14] Under this section, with a few narrow exceptions (none of

---

**12.** In so concluding, the Court does not give credence to, much less adopt, Benton's obviously incorrect argument that remand should be denied because "the Board in its Notice of Appeal filed with the Escambia County Circuit Court named the Board as the Plaintiff, and the Student as the Defendant." (Benton Opposition Brief (doc. 10), at ¶ 13.) Contrary to these representations, the Notice of Appeal reflects that the Board designated itself as "Appellant," and Benton as "Appellee." (*See* doc. 1, at Exh. A.) The Court is at a loss to understand why Benton has so emphatically misstated the content of that Notice in its briefs.

**13.** In opposing the Board's Motion, Benton requests that the Court "issue sanctions

against the Board for its frivolous action" of seeking remand by awarding attorney's fees to Benton. (Benton Response (doc. 8), at 3.) This Motion for Sanctions (incorporated in doc. 8) is **denied.** Although the Court disagrees with the Board's position in its Motion to Remand, the Board's arguments are not so far beyond the borders of reason as to warrant imposition of sanctions for having articulated them. In any event, as shown by footnote 12, *supra,* Benton made his share of ill-conceived arguments relating to the removal and subsequent Motion to Remand, as well.

**14.** In its reply brief, the Board confusingly indicates that it is requesting a stay "under the authority of 20 U.S.C. § 1415(e)(3)(A)."

which appear to apply here), *"during the pendency of any proceedings* conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, *the child shall remain in the then-current educational placement of such child."* § 1415(j) (emphasis added). Where it applies, the injunctive effect of § 1415(j) is automatic, without the necessity of any further showing. *See, e.g., Wagner v. Board of Educ. of Montgomery County,* 335 F.3d 297, 301 (4th Cir.2003) (operation of "stay put" provision "is automatic; the party seeking it need not meet the usual requirements for obtaining preliminary injunctive relief"); *Johnson ex rel. Johnson v. Special Educ. Hearing Office, State of Cal.,* 287 F.3d 1176 (9th Cir.2002) (explaining that § 1415(j) "requires the educational agency to maintain a disabled child's educational program until any placement dispute between the agency and the child's parents is resolved"); *Rodiriecus L. v. Waukegan School Dist. No. 60,* 90 F.3d 249, 253 (7th Cir.1996) (if there is no question that child is disabled, "stay put" provision is an automatic injunction applicable whenever statutory criteria are met); *Drinker by Drinker v. Colonial School Dist.,* 78 F.3d 859, 864 (3rd Cir.1996) (opining that "stay put" provision "functions, in essence, as an au-

tomatic preliminary injunction" imposing an "absolute rule in favor of the status quo" during IDEA proceedings); *Warton v. New Fairfield Bd. of Educ.,* 125 F.Supp.2d 22, 25 (D.Conn.2000) ("Where a party is seeking an order from the court upholding a stay-put placement under the IDEA, the IDEA statute is in effect an automatic preliminary injunction.").[15] As one appeals court has asserted, "when presented with an application for section 1415(j) relief, a district court should simply determine the child's then-current educational placement and enter an order maintaining the child in that placement." *Wagner,* 335 F.3d at 301.

Clearly, then, the Board's Motion for Stay hinges in the first instance on whether § 1415(j) applies. To make this determination, the Court must consider: (a) whether this litigation qualifies as "proceedings conducted pursuant to this section"; and (b) whether the Administrative Decision would effect a change in Benton's "educational placement." The Court answers both of these questions in the affirmative.

### B. The "Stay Put" Provision Applies to this Action.

■ Under the plain language of § 1415(j), the present action constitutes

(Reply Brief (doc. 11), at 6.) No such section exists in the current version of the statute; rather, the Board is referencing a code section that was amended and moved to § 1415(j) back in 1997. To avoid needless obfuscation of legal arguments, counsel should cite to the current version of the IDEA, rather than to code sections that have not existed for nearly a decade.

15. Given these authorities, the Board's argument on pages 2 through 5 of its reply brief that a four-part test using traditional preliminary injunction factors must be performed to determine the propriety of a stay in the IDEA setting appears inaccurate. The Board's contention in this regard is all the more remarkable because: (a) it conflicts with the Board's

reliance on § 1415(j) later in the very same brief; (b) the Board's evidentiary showing on those factors (*i.e.,* likelihood of success on the merits) is wholly inadequate to entitle it to preliminary injunctive relief on that basis; and (c) it cites only *Susquenita School District v. Raelee S. By and Through Heidi S.,* 96 F.3d 78 (3rd Cir.1996) for the proposition that such a standard applies, even though *Susquenita* neither held nor implied such an outcome, but merely mentioned in passing that the lower court had applied such factors. *Id.* at 80. To the extent that the Board seeks a stay based on traditional preliminary injunction factors, the Court declines to do so because even if those factors applied, the Board's showing fails to demonstrate their presence here.

"proceedings conducted pursuant to this section," so as to trigger the "stay put" provision. *See, e.g., Wagner*, 335 F.3d at 300 (explaining that "stay put" section was implemented because due process hearing and ensuing civil action by aggrieved party may take a significant amount of time to run their course); *Rodiriecus L.*, 90 F.3d at 252 ("stay put" section keeps disabled child in then-current educational program throughout pendency of often lengthy administrative and judicial appeals process); *Drinker*, 78 F.3d at 865 (indicating that "stay put" provision preserves the status quo "until the underlying IDEA litigation is resolved"). It is inconceivable that this lawsuit could be anything other than "proceedings conducted pursuant to this section" for § 1415(j) purposes.

Likewise, there seems little room for doubt that the Administrative Decision would, in fact, alter Benton's "educational placement." After all, "the current educational placement is typically the placement described in the child's most recently implemented IEP." *Johnson*, 287 F.3d at 1180; *see also Wagner*, 335 F.3d at 301 (noting that student's then-current placement was that established by his most recent IEP); *Drinker*, 78 F.3d at 867 ("the dispositive operative factor in deciding a child's 'current educational placement' should be the [IEP] actually functioning when the 'stay put' is invoked"); *Spilsbury*

*v. District of Columbia*, 307 F.Supp.2d 22, 26–27 (D.D.C.2004) ("the IDEA clearly intends 'current educational placement' to encompass the whole range of services that a child needs; the term 'current educational placement' cannot be read to only indicate which physical school building a child attends"). Based on these authorities, it is evident that Benton's "then-current educational placement" equates to the IEP in effect at the time the administrative proceedings were initiated in March 2004. By requiring a new IEP (to be prepared after a functional behavior assessment has been performed regarding Benton's autistic behavior) with a behavior modification component, the Administrative Decision clearly would alter Benton's "then-current educational placement."

In sum, then, the record before the Court reflects that the § 1415(j) criteria are present here, and that invocation of that section's automatic stay requirement would preclude enforcement of the Administrative Decision during the pendency of these proceedings. In opposition to the Motion for Stay, Benton's counsel has failed to identify any compelling argument or explanation why the "stay put" provision should not apply.[16] Instead, he has opted to rely on conclusory, vague references to general legal principles that either have no application here or are trumped by straightforward application of § 1415(j).[17] Therefore, it is the opinion of

---

**16.** To be sure, Benton's counsel is not entirely to blame for this oversight. In its Motion to Stay, the Board inexplicably failed to identify any legal authority for the proposition that such a stay would be proper. The February 1 Order (doc. 7) setting a briefing schedule on the Motion to Stay specifically directed the parties to "include in their submissions citations to case law and other authorities that they contend support their respective positions." (*Id.* at 1.) Although Benton did not mention § 1415(j) in his opposition brief, the Board's reply brief unequivocally invoked the "stay put" provisions of the IDEA. Had Benton wished to be heard on that point, he could

have sought leave to file a sur-reply. This he has not done, so the briefs identify no cogent arguments or authorities against application of § 1415(j) to these proceedings. The Court therefore lacks the benefit of any legal argument against application of the "stay put" provision of the IDEA here.

**17.** For example, Benton relies on the Alabama Administrative Procedures Act, Ala. Code § 41–22–20(c), for the proposition that filing a notice of appeal does not, in and of itself, stay enforcement of an agency decision. (Opposition Brief (doc. 9), ¶ 6.) However, that a notice of appeal, considered in isolation, does not stay enforcement of an agency deci-

the undersigned that, unless there is an agreement by the parties, the IDEA's "stay put" provision precludes Benton from pursuing administrative action to enforce the outcome of the first hearing, even as the Board's appeal of that outcome is pending. The Court thus turns to the dispositive question of whether the parties have agreed to change Benton's educational placement.

### C. The Administrative Decision Constitutes an Agreement to Alter Benton's Placement.

Notwithstanding the application of § 1415(j), the status quo is not necessarily frozen at the point of the student's most recent IEP. Rather, the "stay put" provision requires a student's educational placement to remain unchanged "unless the State or local educational agency and the parents otherwise agree." 20 U.S.C. § 1415(j). This provision is of crucial importance to the instant Motion for Stay, inasmuch as the Administrative Decision constitutes such an agreement, as a matter of law.

In March 1999, the U.S. Secretary of Education amended the federal regulations interpreting the "stay put" statute to provide as follows:

sion says nothing about whether the § 1415(j) mechanism operates to stay such enforcement throughout litigation in IDEA proceedings. *See Honig v. Doe,* 484 U.S. 305, 326 n. 9 108 S.Ct. 592, 98 L.Ed.2d 686 (1988) (pointing out that "state law does not define the scope of" the IDEA "stay put" provision). Likewise, the admonition of 28 U.S.C. § 1450 that orders predating an action's removal remain in full force and effect unless modified or dissolved by the district court simply begs the question as to whether such modification or dissolution (or stay) is appropriate under the particular circumstances here. (Opposition Brief, ¶ 7.) Benton also alludes to concepts of "irreparable harm," "expedient process," "judicial economy," and lack of "compelling rea-

"If the decision of a hearing officer in a due process hearing conducted by the SEA or a State review official in an administrative appeal agrees with the child's parents that a change of placement is appropriate, *that placement must be treated as an agreement between the State or local agency and the parents* for purposes of [§ 1415(j)]."

34 C.F.R. § 300.514(c) (emphasis added).[18]

This regulation codified pre-existing common law. *See School Committee of Town of Burlington, Mass. v. Department of Educ. of Mass.,* 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985) (administrative decision in favor of the parents "would seem to constitute agreement by the State to the change of placement"); *St. Tammany Parish School Bd. v. State of La.,* 142 F.3d 776, 787 (5th Cir.1998) (district court did not err in concluding that, for "stay put" purposes, administrative decision favoring parents constituted agreement between State and parents as to appropriate placement during pendency of litigation); *Susquenita Sch. Dist. v. Raelee S. By and Through Heidi S.,* 96 F.3d 78, 83 (3d Cir. 1996) (holding that "[t]he decision of the Supreme Court in *Burlington* established that a ruling by the education appeals panel in favor of the parents' position con-

son" for delaying a second administrative hearing, but offers no legal framework through which such notions might make a difference, given the apparently automatic application of § 1415(j).

18. In enacting this amendment, the Secretary relied on the "long-standing judicial interpretation of the Act's pendency provision that when a State hearing officer's or State review official's decision is in agreement with parents that a change in placement is appropriate, that decision constitutes an agreement by the State agency and the parents for purposes of determining the child's current placement during subsequent appeals." 64 Fed.Reg. 12615 (Mar. 12, 1999).

stitutes agreement for purposes of" § 1415(j)); *Clovis Unified School Dist. v. California Office of Administrative Hearings*, 903 F.2d 635, 641 (9th Cir.1990) (explaining that "stay put" provision will not be interpreted in a manner "that would force parents to leave a child in what they feel may be an inappropriate educational placement ... after a successful administrative ruling"); *Board of Educ. of Oak Park & River Forest High School Dist. No. 200 v. Illinois State Bd. of Educ.*, 10 F.Supp.2d 971, 978 (N.D.Ill.1998) (relying on *Burlington* and *Susquenita* to hold that "a final administrative decision constitutes agreement specifically by the State to the changed placement").

Not surprisingly, since its passage, § 300.514(c) has been consistently used by courts as a basis for denying "stay put" protections during litigation where the state hearing officer entered a decision in favor of the parents, and instead interpreting the administrative decision as reflecting the "current placement" for § 1415(j) purposes. *See Board of Educ. of Pawling Central School Dist. v. Schutz*, 290 F.3d 476, 484 (2nd Cir.2002) (holding, based on § 300.514(c) and case authorities, that a state administrative review finding "that a proposed IEP is inappropriate for a child constitutes a change in the child's current educational placement for purposes of interpreting ... § 1415(j)"); *West Platte R-II School District v. Wilson ex rel. L.W.*, 2004 WL 1895136, *2 (W.D.Mo. July 20, 2004) (collecting cases and holding that "an administrative decision in favor of the parents is equivalent to an agreement between the state agency and the parents and, therefore, represents the child's current education placement for purposes of the 'stay put' provision"); *Board of Educ. of Pine Plains Central School Dist. v. Engwiller*, 170 F.Supp.2d 410, 414 (S.D.N.Y.2001) ("the law treats an administrative decision favorable to the parents and against the District as creating a *de jure* agreement between the parents and the State"); *Murphy v. Arlington Cent. School Dist. Bd. of Educ.*, 86 F.Supp.2d 354, 358 (S.D.N.Y.2000) ("once the parents receive an administrative decision in their favor, the *current educational placement* changes in accordance with that decision").[19]

■ Given this groundswell of authority both prior to and following the amendment of 34 C.F.R. § 300.514, the Court finds that the Administrative Decision effective-

---

**19.** These authorities are consistent with the prevailing wisdom that "[t]he purpose of the stay-put provision is to give the child's parents the choice of keeping the child in his existing program until their dispute with the school authorities is resolved." *Rodiriecus L.*, 90 F.3d at 252. Indeed, the Supreme Court has observed that this provision was "very much meant to strip schools of the unilateral authority they had traditionally employed to exclude disabled students, particularly emotionally disturbed students, from school." *Honig v. Doe*, 484 U.S. 305, 323, 108 S.Ct. 592, 604, 98 L.Ed.2d 686 (1988). These discussions imply (without expressly stating) that § 1415(j) may be a one-way lever, operating to freeze a child's educational placement when the child appeals from an adverse rul-

ing at the administrative level, but not to have a corresponding effect if the school appeals from a ruling favorable to the child. The interpretation of § 1415(j) adopted by § 300.514(c), as well as the foregoing cases, reflects the reality that the "stay put" provision is designed to protect disabled students from unilateral exclusion during IDEA appeals, not to bar disabled students from the benefit of their administrative successes during the pendency of litigation appealing such an outcome. *See Susquenita*, 96 F.3d at 84 (decrying the notion that the "stay put" provisions of the IDEA "should be used here as a weapon by the Susquenita School District to force parents to maintain a child in a public school placement which the state appeals panel has held inappropriate").

ly constitutes an agreement between the State of Alabama and Benton's parents as to Benton's current placement for purposes of this litigation. The relevant placement for § 1415(j) purposes is not the most recent IEP predating Benton's first request for hearing, but rather is that ordered by the Hearing Officer in November 2004. As such, the "stay put" provisions of the IDEA in no way preclude enforcement of the placement ordered in the Administrative Decision during the pendency of this appeal.[20] The Motion for Stay is due to be, and the same hereby is, **denied**.[21]

## IV. Conclusion.

For all of the foregoing reasons, it is hereby ordered as follows:

1. The Board's Motion to Remand (doc. 3) this action to Escambia County Circuit Court is **denied**, on the ground that Benton is properly classified as the "defendant" and had a legal right to remove this action.

2. The Board's Motion for Stay of Administrative Due Process Hearing Proceedings (doc. 6) is denied, on the ground that the Board has failed to show entitlement to relief under either the traditional injunctive factors or the "stay put" provision of 20 U.S.C. § 1415(j).

3. Benton's Motion for Sanctions (doc. 8) is **denied**, on the ground that Benton has failed to show that the Board's position relative to the Motion to Remand was so unreasonable as to warrant imposition of sanctions.

**20.** In so deciding, the Court is cognizant that the Board and Benton's mother agreed to a new IEP in December 2004, one month after the Administrative Decision. That IEP lacked any reference to the behavior modification requirements set forth in the Administrative Decision. Apparently, the Board would argue that the December 2004 IEP somehow constitutes a waiver of, or otherwise trumps, Benton's right to the relief ordered by the Hearing Officer the previous month. Legal analysis of that question having not been briefed at all by either party, the undersigned declines to express an opinion as to its merits; rather, this issue should be directed to Hearing Officer Cole, in the first instance. The Court finds only that on the record before it, neither § 1415(j) nor traditional preliminary injunction criteria compel a stay of the pending administrative proceedings.

**21.** Neither § 300.514(c) nor the extensive accompanying case law were addressed in the

parties' briefs. Both parties are culpable in this regard, the Board for claiming that § 1415(j) required a stay without acknowledging a clear line of authority fatal to its request, and Benton for neglecting to proffer any meaningful defense to application of the "stay put" provision. Such oversight of a critical point, and the parties' concomitant superficial treatment of the legal issues implicated by the Motion for Stay, reflects a disquieting lack of investigation in advancing their respective positions. The parties may not, by the simple expedient of filing cursory memoranda, shift to the Court the responsibility of performing their legal research and framing their arguments for them. Regrettably, that is what has occurred here. It is expected that the parties' future submissions will reflect a much heightened level of diligence and attention to detail in researching, formulating and articulating their respective positions than was evidenced in their filings relating to the Motion for Stay.