**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 12-4137
_____

M.R.; J.R., PARENTS OF MINOR CHILD E.R.

v.

RIDLEY SCHOOL DISTRICT,

                         Appellant

---

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(District Court No. 2-11-cv-02235)
District Judge: Honorable Mitchell S. Goldberg

---

Argued October 17, 2013

Before:  RENDELL, JORDAN and LIPEZ*, <u>Circuit Judges</u>

(Opinion filed: February 20, 2014)

John Francis X. Reilly, Esquire  **(Argued)**
230 North Monroe Street
Media, PA 19063-2908

            Counsel for Appellant

Alan L. Yatvin, Esquire  **(Argued)**
Popper & Yatvin
Suite 503
230 South Broad Street
Philadelphia, PA  19102

            Counsel for Appellees

---

O P I N I O N

---

**LIPEZ**, <u>Circuit Judge</u>:

        The "stay-put" provision of the Individuals with Disabilities Education Act ("IDEA") states that a disabled child shall remain in his or her current educational setting

---

        *Honorable Kermit V. Lipez, Senior United States Circuit Judge for the Court of Appeals for the First Circuit, sitting by designation.

during the pendency of proceedings to resolve a dispute over the child's placement.  *See* 20 U.S.C. § 1415(j).  This case requires us to decide two issues of first impression in this Circuit concerning the obligation of school districts to pay for private school education during that interim period:  (1) whether parents are eligible for reimbursement for private school costs if they do not file a claim seeking payment until *after* a court has ruled in favor of the school district, and (2) whether the right to interim funding, if applicable, extends through the time of a judicial appeal.

The district court answered both questions in the affirmative.  It thus held that defendant Ridley School District ("Ridley") must reimburse the plaintiff parents for the cost of roughly three years of their daughter's private school tuition notwithstanding judicial findings disagreeing with the hearing officer – rendered before the parents sought payment – that Ridley had complied with the IDEA by offering the child a free, appropriate education in its own schools.

For the reasons that follow, we affirm the district court's judgment.

## I.

This court has previously described in detail the dispute between Ridley and the plaintiffs – M.R. and J.R. – over the educational placement of plaintiffs' daughter, E.R.  *See Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 264-67 (3d Cir. 2012) ("*Ridley I*").  We briefly review here the factual and procedural background pertinent to the legal issues now before us.

3

E.R. attended kindergarten and first grade at Grace Park Elementary School in the Ridley School District during the 2006-2007 and 2007-2008 school years, receiving special services to address her learning disabilities and health-related problems. During the summer after first grade, plaintiffs concluded that the public school was not meeting their daughter's needs, and they enrolled her at a private school, Benchmark, that specializes in educating students with learning disabilities. Plaintiffs subsequently filed a complaint with the Pennsylvania Department of Education claiming, inter alia, that Ridley had violated the IDEA and the Rehabilitation Act by failing to provide E.R. with a suitable Individualized Education Program ("IEP"), thereby denying her the "free appropriate public education" ("FAPE") required by those laws.[1] *See* 20 U.S.C. § 1412(a)(1)(A); 29

---

[1] The IDEA requires school districts to develop IEPs for children with disabilities to specify how they will be provided with a FAPE. *See* 20 U.S.C. § 1414 (detailing the framework for evaluating a child and creating an IEP). The statute describes a FAPE as "special education and related services" that—

> (A) have been provided at public expense, under public supervision and direction, and without charge;
>
> (B) meet the standards of the State educational agency;
>
> (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and

U.S.C. § 794.[2]  Among other remedies, plaintiffs sought reimbursement for the cost of sending E.R. to Benchmark for second grade.[3]

On April 21, 2009, an administrative hearing officer found that Ridley had committed no violations during E.R.'s kindergarten year, but that E.R. was denied a FAPE for part of first grade and all of second grade.  The hearing officer

---

> (D) are provided in conformity with the individualized education program required under [20 U.S.C. § 1414(d)].

20 U.S.C. § 1401(9).

[2] Section 794, more familiarly known as Section 504 of the Rehabilitation Act, prohibits discrimination in public schools – among other federally funded programs – on the basis of disability.  *See* 29 U.S.C. § 794(b)(2)(B); *see also* 34 C.F.R. § 104.33(a).  We explained in *Ridley I* that "§ 504's 'negative prohibition' is similar to the IDEA's 'affirmative duty'" and also requires schools that receive federal financial assistance to provide qualified students with a FAPE.  *See* 680 F.3d at 280 (quoting *W.B. v. Matula*, 67 F.3d 484, 492 (3d Cir. 1995), *abrogated on other grounds by A.W. v. Jersey City Pub. Schs.*, 486 F.3d 791, 793 (3d Cir. 2007)).

[3] In moving E.R. to private school without the school district's acquiescence, the parents were initially responsible for her tuition and other costs.  At issue in this case is the extent, if any, of the school district's reimbursement obligation.

awarded compensatory education for the 2007-2008 school year (when E.R. attended first grade at the public school) and ordered Ridley to reimburse the plaintiffs for the tuition and transportation costs associated with E.R.'s enrollment at Benchmark in 2008-2009.[4] Nearly two years later, in February 2011, a federal district court reversed the hearing officer's placement assessment, finding that Ridley's proposed IEP was adequate and, hence, that the school district had offered E.R. a FAPE in the local public school. This court affirmed the district court's ruling on May 17, 2012. *See Ridley I*, 680 F.3d at 283.

Meanwhile, in March 2011, after filing their appeal from the district court's judgment, plaintiffs sent a letter to the school district requesting payment for E.R.'s Benchmark costs from the date of the hearing officer's decision forward – at that point, from April 2009 through spring 2011 – pursuant to the IDEA's stay-put provision. *See infra* Section II (describing 20 U.S.C. § 1415(j) and related authority). When the school district declined to pay, plaintiffs responded with this action claiming that the IDEA required Ridley to finance E.R.'s private placement until all appeals had concluded in the previous litigation over the adequacy of her IEP.

Ridley denied responsibility for the Benchmark expenses on both procedural and substantive grounds. The school district asserted that the demand for interim tuition was barred at the threshold because it was untimely. This argument relied on three theories: res judicata, the

---

[4] E.R. remained at Benchmark for third, fourth and fifth grades as the case progressed through the courts, and her parents paid her tuition.

6

compulsory counterclaim requirement of Federal Rule of Civil Procedure 13, and the statute of limitations. Ridley also contended that plaintiffs were not entitled to relief because, by the time of their second IDEA lawsuit, the district court had already held that Ridley had properly designated the local public school as E.R.'s appropriate placement. The school district argued, in effect, that its validated placement determination had become the baseline for determining the parents' entitlement to a remedy and, accordingly, the IDEA did not provide for recovery of the private school costs.

On cross-motions for judgment on the pleadings, the district court ruled in favor of plaintiffs. The court rejected each of Ridley's timeliness contentions and concluded that the IDEA's stay-put provision entitled the parents to reimbursement for the costs they incurred to send E.R. to Benchmark for the entire period they had requested. The costs at issue – $57,658.38, as stipulated by the parties – covered the approximately three years from the hearing officer's decision in April 2009 through proceedings in the court of appeals (which had by then concluded with this court's 2012 decision affirming the district court's judgment).

This appeal followed. Ridley again challenges both the timeliness of plaintiffs' reimbursement claim and the legal basis for the award. Our review of the district court's judgment on the pleadings is de novo. *See Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 259 n.25 (3d Cir. 2010).

7

## II.

The premise of the IDEA is that parents and schools working together to design an IEP is the ideal way to reach the statute's goal of a FAPE for every child. *See Ridley I*, 680 F.3d at 269; *see also Schaffer v. Weast*, 546 U.S. 49, 53 (2005). Congress anticipated, however, that "the collaborative process" may at times break down. *Ridley I,* 680 F.3d at 269. Hence, the Act allows either party to respond to a stalemate in the discussions by requesting an impartial due process hearing before a state or local administrative officer. *See* 20 U.S.C. § 1415(f); *Sch. Comm. of Town of Burlington v. Dep't of Educ.,* 471 U.S. 359, 368-69 (1985) (*"Burlington")*; *Ridley I*, 680 F.3d at 269. A variety of disputes may arise concerning placement. For example, the parents may argue for removing the child from public school because they believe the services are inadequate. Or the school district might argue for the same result, over the parents' objection, because it considers the child too disruptive to be in a regular school setting. Alternatively, either party could be advocating *for* public-school placement – with the school district insisting that an expensive specialized private school is unnecessary or the parents insisting that participation in a regular classroom is essential for their child's development. *See generally Honig v. Doe,* 484 U.S. 305, 323-26 (1988) (discussing school system's limited authority to exclude disabled students); *Burlington*, 471 U.S. at 373 (stating that one purpose of the stay-put provision "was to prevent school officials from removing a child from the regular classroom over the parents' objection pending completion of the review proceedings"); *id.* at 369-70 (discussing whether parents are entitled to reimbursement for private school tuition); *Drinker v. Colonial*

*Sch. Dist.*, 78 F.3d 859, 861-63 (3d Cir. 1996) (addressing parents' objection to school district's plan to move child from a placement outside the district to a local public school).

The parties have the right to seek state or federal court review of the administrative decision, 20 U.S.C. § 1415(i)(2)(A), and – under the provision at issue in this case – the child has the right to remain in his or her "then-current educational placement" during the pendency of the dispute resolution proceedings, *id.* § 1415(j). Section 1415(j) states, in pertinent part:

> [D]uring the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child . . . .[5]

This provision, known as the IDEA's "stay-put rule," serves "in essence, as an automatic preliminary injunction," *Drinker*, 78 F.3d at 864, reflecting Congress's conclusion that a child with a disability is best served by maintaining her educational status quo until the disagreement over her IEP is resolved, *Pardini v. Allegheny Interm. Unit*, 420 F.3d 181, 190 (3d Cir. 2005); *Drinker*, 78 F.3d at 864. "'Once a court ascertains the student's current educational placement, the movants are

---

[5] The stay-put provision was previously codified at 20 U.S.C. § 1415(e)(3). Its language did not change when it was moved.

entitled to an order [maintaining that placement] without satisfaction of the usual prerequisites to injunctive relief.'" *Drinker*, 78 F.3d at 864 (quoting *Woods v. N.J. Dep't of Educ.*, No. 93-5123, 20 Indiv. Disabilities Educ. L. Rep. (LRP Publications) 439, 440 (3d Cir. Sept. 17, 1993)); *see also Pardini*, 420 F.3d at 188 ("Congress has already balanced the competing harms as well as the competing equities"); *Zvi D. v. Ambach*, 694 F.2d 904, 906 (2d Cir. 1982) ("The statute substitutes an absolute rule in favor of the status quo for the court's discretionary consideration of the factors . . . .").

The stay-put rule thus requires that the child's placement under the IDEA at the time a disagreement arises between the parents and the school district – what the statute terms the "then-current educational placement" – be protected while the dispute is pending. To determine that placement, this court has looked to the IEP "actually functioning when the 'stay put' is invoked." *Drinker*, 78 F.3d at 867 (citing *Thomas v. Cincinnati Bd. of Educ.*, 918 F.2d 618, 625-26 (6th Cir. 1990)); *see also Susquenita Sch. Dist. v. Raelee S.*, 96 F.3d 78, 83 (3d Cir. 1996) ("*Raelee S.*"). The operative placement could be either a public school or a private school that the local district was financing to satisfy the requirement that every child be given a *free*, appropriate education. *See, e.g., Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 12 (1993) ("Congress intended that IDEA's promise of a 'free appropriate public education' for disabled children would normally be met by an IEP's provision for education in the regular public schools or in private schools chosen jointly by school officials and parents."); *Raelee S.*, 96 F.3d at 86 (noting that providing a FAPE may involve "'placement in

private schools at public expense'" (quoting *Burlington*, 471 U.S. at 369)).[6]

The stay-put provision's protective purpose means that "it is often invoked by a child's parents in order to maintain a placement where the parents disagree with a change proposed by the school district." *See Raelee S.*, 96 F.3d at 83. During "the pendency" of the dispute process, the child is entitled to remain in her IEP-specified educational setting.[7] *See* 20 U.S.C. § 1415(j). Where the parents seek a *change* in placement, however, and unilaterally move their child from an IEP-specified program to their desired alternative setting, the stay-put rule does not immediately come into play. *Raelee S.*, 96 F.3d at 83. In such circumstances, the parents will be responsible for the costs of the child's new placement – at least initially.

The new placement can become the educational setting protected by the stay-put rule if the parents and "the State or local educational agency" agree to the change. *See* 20 U.S.C. § 1415(j). Also, importantly, a decision favorable to the parents during the administrative review process "must be

---

[6] If the dispute concerns a child who is applying for initial admission to a public school, the child "shall, with the consent of the parents, be placed in the public school program" until the dispute resolution proceedings have concluded. *See* 20 U.S.C. § 1514(j); *see also* 34 C.F.R. § 300.518(b).

[7] We have referred to this educational setting as the child's "pendent placement" – a term of art drawn from the language of § 1415(j). *See Raelee S.*, 96 F.3d at 80 n.1.

treated as an agreement between the State and the parents," 34 C.F.R. § 300.518(d); *see also Burlington,* 471 U.S. at 372 (noting that an administrative decision in favor of the parents and private school placement "would seem to constitute agreement by the State to the change of placement"); *Raelee S.*, 96 F.3d at 83 (citing *Burlington*).[8] Accordingly, an administrative ruling validating the parents' decision to move their child from an IEP-specified public school to a private school will, in essence, make the child's enrollment at the private school her "then-current educational placement" for purposes of the stay-put rule. Having been endorsed by the State, the move to private school is no longer the parents' unilateral action, and the child is entitled to "stay put" at the private school for the duration of the dispute resolution proceedings. *See Raelee S.*, 96 F.3d at 83-84.

Although § 1415(j) does not specify which party pays when a child's pendent placement becomes a private school based on an administrative decision, the school district's obligation to do so is well established by case law. *See Raelee S.*, 96 F.3d at 84, 86. Hence, the school district is

---

[8] In *Raelee S.*, this court declined to decide whether a decision in favor of the parents by a hearing officer – as opposed to an administrative appellate panel – "would constitute agreement by the state for purposes of pendent placement and tuition reimbursement." *See* 96 F.3d at 85 n.8. The subsequently enacted Department of Education regulation addressing pendent placement explicitly includes a hearing officer's decision within the scope of the pendent-placement protection, and we now do likewise. *See* 34 C.F.R. § 300.518(d).

obliged to fund a private placement if it was either the educational setting prescribed by the current IEP or is subsequently designated by a hearing officer or administrative appeal official as the appropriate setting to meet a child's needs.  In this case, the stay-put provision became effective in April 2009, when the hearing officer determined that Ridley had denied E.R. a FAPE and concluded that Benchmark was her appropriate educational setting.  E.R. could thus "stay put" at Benchmark at the school district's expense while the court proceedings were pending.  Because E.R. was entitled to reimbursement for her costs at Benchmark beginning in April 2009, the parents could have requested that Ridley reimburse any tuition they already had paid for the remaining portion of the 2008-2009 school year and also could have asked the school district to reimburse the Benchmark costs in the following years (or pay those amounts as they became due).

At issue in this case is whether the school district's financial responsibility dissolves if the parents do not request reimbursement for their out-of-pocket private school costs until after an administrative decision in their favor has been reversed by a court upon further review.  Ridley emphasizes that the remedial subsection of the IDEA provision that authorizes "[a]ny party aggrieved" by the administrative ruling to file a civil action allows a court to grant only "such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(A), (i)(2)(C)(iii).[9]  The school district maintains

---

[9]  A civil action may be brought with "respect to the [administrative] complaint," 20 U.S.C. § 1415(i)(2)(A), and complaints may be filed "with respect to any matter relating to the identification, evaluation, or educational placement of

13

that it was inappropriate in this case to award reimbursement for private schooling that the district court had found unnecessary by the time the request for payment was made. Ridley argues that the court ruling returned E.R.'s placement to Grace Park Elementary School with respect to the school district's funding obligation, eliminating the justification for any interim reimbursement. Ridley further asserts that, even if we conclude that interim reimbursement is required under the IDEA, any obligation for interim funding does not include the period of the appeal to the Third Circuit.

Before confronting those merits arguments, we address Ridley's procedural claims.

### III.

Ridley asserts that E.R.'s parents should have demanded tuition reimbursement for their daughter's pendent placement as part of the relief they requested through counterclaims in the earlier action, which was filed by the school district to challenge the hearing officer's ruling. Ridley offers a trio of rationales to support its contention that plaintiffs' request for reimbursement should be denied as untimely. We find none of them persuasive.

### A. Res judicata

Ridley argues that plaintiffs, having failed to assert their claim for reimbursement in the earlier IDEA lawsuit between the same parties, may not do so in this subsequent

---

the child, or the provision of a free appropriate public education to such child," *id.* § 1415(b)(2)(B)(6)(A).

14

action under the principles of res judicata, or claim preclusion. To rely on the affirmative defense of res judicata, a party must establish three elements: (1) a final judgment on the merits in a prior proceeding that involved (2) the same parties or their privies and (3) the same "cause of action." *See, e.g., Duhaney v. Att'y Gen.*, 621 F.3d 340, 347 (3d Cir. 2010); *Sheridan*, 609 F.3d at 260 (explaining that "the central purpose of the [res judicata] doctrine [is] to require a plaintiff to present all claims arising out [of] the same occurrence in a single suit" (third alteration in original) (internal quotation mark omitted)). The first two elements are not disputed. In examining the similarity of the claims (the third element), we focus on "whether the acts complained of [are] the same, whether the material facts alleged in each suit [are] the same and whether the witnesses and documentation required to prove such allegations [are] the same." *United States v. Athlone Indus., Inc.*, 746 F.2d 977, 984 (3d Cir. 1984).

We agree with the district court that the reimbursement claim in this case differs materially from the issues addressed in *Ridley I*. Although both cases concern the rights of E.R. and her parents under the IDEA, the similarity ends there. *Ridley I* focused on the substance of an appropriate education for E.R., while the current case is a payment dispute over E.R.'s stay-put expenses. The former was fact-intensive, requiring the courts to review testimony and documentary evidence about E.R.'s needs and the school district's plans for meeting them, while the latter is centered on the legal question of financial responsibility and the undisputed fact that a hearing officer ruled in plaintiffs' favor.[10] That the

---

[10] The second action theoretically also involves fact-finding on the cost of E.R.'s pendent placement at Benchmark, but

15

cases are related does not erase these significant differences between the causes of action at issue. Indeed, this court previously has recognized, albeit in the different context of collateral-order review, that "resolution of [pendent-placement and tuition-reimbursement rights] is completely separate from the merits issues which focus on the adequacy of the proposed IEP." *Raelee S.*, 96 F.3d at 81 n.4 (allowing appeal of pendent-placement ruling as a collateral order subject to review under *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949)); *see also A.D. v. Haw. Dep't of Educ.*, 727 F.3d 911, 913 (9th Cir. 2013) (holding that a stay-put order "resolves an important issue completely separate from the merits of the child's ultimate placement").

We therefore conclude that the res judicata doctrine does not bar this action.

## B. The Compulsory Counterclaim Rule

Federal Rule of Civil Procedure 13(a) requires a party to assert as a counterclaim any cause of action that is available against the opposing party that "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." The failure to plead a compulsory counterclaim bars a later independent action on that claim. *Baker v. Gold Seal Liquors, Inc.*, 417 U.S. 467, 469 n.1 (1974); *New York Life Ins. Co. v. Deshotel*, 142 F.3d 873, 882 (5th Cir. 1998); 6 Charles Alan Wright, Arthur R. Miller &

---

the parties have stipulated to the amount at issue. Moreover, evidence proving tuition and transportations costs is plainly distinct from the evidence needed for the merits issues in *Ridley I*.

16

Mary Kay Kane, *Federal Practice and Procedure* § 1417, at 147 (3d ed. 2010).

The inquiry to determine if a claim is compulsory under Rule 13(a) is "whether the counterclaim 'bears a logical relationship to an opposing party's claim.'" *Transamerica Occidental Life Ins. Co. v. Aviation Office of Am., Inc.*, 292 F.3d 384, 389 (3d Cir. 2002) (quoting *Xerox Corp. v. SCM Corp.*, 576 F.2d 1057, 1059 (3d Cir. 1978)). This court has stated that a logical relationship exists "where separate trials on each of the[] respective claims would involve a substantial duplication of effort and time by the parties and the courts." *Great Lakes Rubber Corp. v. Herbert Cooper Co.*, 286 F.2d 631, 634 (3d Cir. 1961); *see also Transamerica,* 292 F.3d at 389-90. The compulsory counterclaim inquiry thus requires essentially the same comparison between claims as the res judiciata analysis. *See Transamerica*, 292 F.3d at 391 (noting "the close connection between Rule 13(a) and the doctrine of claim preclusion").

As discussed above, despite a relationship between the two lawsuits, there is no meaningful overlap between the facts and law underlying the different claims at issue. *Cf. Ross v. Bd. of Educ.*, 486 F.3d 279, 283-84 (7th Cir. 2007) (holding that current claims under Americans with Disabilities Act, Rehabilitation Act, and 42 U.S.C. § 1983 were compulsory counterclaims in a prior suit where both lawsuits "deal with [the school district's] placement decisions, the services it offered [the plaintiff], and its response to her disability"). Plaintiffs were therefore not compelled to advance their pendent-placement reimbursement demand by means of a counterclaim.

Moreover, as the district court observed, Rule 13(a) "effectively operates as a waiver," *M.R. v. Ridley Sch. Dist.*, No. 11-2235, 2012 WL 3279230, at *7 (Aug. 13, 2012) (*Ridley II*), and this court previously ha**s** expressed doubt that "parents can lose their stay put protection except by affirmative agreement to give it up," *Drinker*, 78 F.3d at 868. E.R.'s parents did not explicitly agree to forgo their child's stay-put rights. Hence, as in *Drinker*, "even assuming that in a proper case the stay put provision can be waived, we find nothing in the record here that leads us to believe this is such a case." *Id.*

Accordingly, Rule 13(a) does not foreclose this independent action seeking reimbursement for E.R.'s interim placement expenses. We emphasize, however, that our conclusion that neither res judicata nor Federal Rule of Civil Procedure 13(a) bars the instant action does not mean that claims for stay-put reimbursement should not be brought in the same civil action with substantive IDEA claims, such as those addressing the child's placement or the provision of a FAPE. We hold only that, in the context of this case, plaintiffs were permitted to bring them separately.

## C. Statute of Limitations

Ridley argues that plaintiffs' claim is barred by the IDEA provision requiring "[a]ny party aggrieved" by a hearing officer's decision to file suit within ninety days of that decision. *See* 20 U.S.C. § 1415(i)(2)(A), (B). As the district court concluded, that statutory limitations period does not by its terms apply to plaintiffs' stay-put reimbursement claim. Although the parents did seek reversal of the hearing

18

officer's decision on certain issues,[11] they had prevailed on the issue of E.R.'s placement at Benchmark for second grade. That favorable decision included an award of E.R.'s tuition and transportation costs for 2008-2009 and, under the stay-put provision, made Benchmark E.R.'s pendent placement going forward with the right to interim tuition reimbursement.[12] Hence, the parents were not aggrieved by the hearing officer's decision on the issue raised in this case. Ridley points to no other applicable limitations period, and we therefore reject its statute-of-limitations defense to plaintiffs' claim.

---

[11] Their pleading in response to Ridley's Petition for Review alleged, inter alia, that the hearing officer had erred in finding that Ridley did not deny E.R. a FAPE for the 2006-2007 school year and in finding that she was not improperly denied extended programming for the summer of 2007.

[12] After the courts reversed the hearing officer's ruling that E.R.'s IEP for the 2007-2008 and 2008-2009 school years was inadequate, plaintiffs were no longer entitled to reimbursement for the costs of E.R.'s second grade year at Benchmark (2008-2009) based on the school district's failure to provide her a FAPE. At issue in this case is whether the stay-put provision gives them a separate basis to recoup a portion of their costs for that year (from the date of the hearing officer's decision in April 2009 through the end of the school year), as well as the costs for E.R.'s enrollment at Benchmark through the date of this court's decision in May 2012 (i.e., for the entire 2009-2010 and 2010-2011 school years and for most of the 2011-2012 school year ).

**IV.**

Ridley's challenge on the merits also focuses on issues of timing. Its primary argument is that E.R.'s parents are not entitled to *any* reimbursement under § 1415(j) because they filed their claim for payment too late, i.e., after the administrative ruling in their favor was reversed by the district court. The school district further argues that, even if the parents may recover some of the private school costs, the covered period ended with the district court's entry of judgment rather than at the time of the appeals court's decision. Both contentions require us to consider aspects of the stay-put right that this court has not previously addressed.

Ridley's assertion that plaintiffs' right to reimbursement expired when the district court overturned the hearing officer's decision necessarily depends on two assumptions about how the stay-put scheme works. First, the school district maintains that the reimbursement right does not ripen until a claim seeking payment is presented to the court. Second, Ridley contends that once the district court ruled that Ridley had offered E.R. a FAPE in its public schools, Benchmark was no longer E.R.'s pendent placement. In Ridley's view, the parents failed to seek payment while the private school was designated as E.R.'s pendent placement and, hence, their potential right to reimbursement never ripened into an entitlement.

We consider below Ridley's two assumptions: (1) that the right to reimbursement ripens only when parents file a claim with the court seeking payment, and (2) that E.R.'s relevant educational placement had returned to the public school by the time her parents filed their claim. We then

20

address Ridley's argument that the stay-put financing obligation lasts only until judgment at the district court.

## A. When Does the Right to Reimbursement Accrue?

Ridley argues that the IDEA does not automatically provide for reimbursement for the cost of private schooling during the stay-put period and that parents must make an affirmative request to the court for that remedy. As support, the school district cites the IDEA's remedial provision, 20 U.S.C. § 1415(i)(2)(C)(iii), which states that a court "shall grant such relief as [it] determines is appropriate." Ridley infers from that statutory language that parents have no entitlement to stay-put reimbursement until a court rules that it is "appropriate."

We reject this interpretation as inconsistent with the IDEA's stay-put guarantee and this court's prior case law. The stay-put provision – titled "Maintenance of current educational placement" – directs that "the child *shall* remain in the then-current educational placement" throughout the pendency of any proceedings conducted to resolve a dispute over the provision of a FAPE. 20 U.S.C. § 1415(j) (emphasis added). Ridley does not dispute that the hearing officer's decision in this case had the effect of switching E.R.'s pendent placement from the public school recommended by her IEP to the private Benchmark School. As noted above, *see supra* Section II, we have expressly held that financing goes hand-in-hand with pendent private-school placement:

> It is undisputed that once there is a state agreement with respect to pendent placement, *a fortiori,* financial responsibility on the part of

21

the local school district follows. Thus, from the point of the [state administrative] decision forward . . . [the student's] pendent placement, by agreement of the state, is the private school and [the school district] is obligated to pay for that placement.

*Raelee S.*, 96 F.3d at 84; *see also Bd. of Educ.* v. *Schutz*, 290 F.3d 476, 484 (2d Cir. 2002) (holding that "once the parents' challenge [to a proposed IEP] succeeds . . . , consent to the private placement is implied by law, and the requirements of § 1415(j) become the responsibility of the school district").

We have thus recognized that the stay-put provision itself impliedly, and necessarily, deems reimbursement for the costs of pendent placement in a private school an "appropriate" remedy. *See Raelee S.*, 96 F.3d at 87 ("Without interim financial support, a parent's 'choice' to have his child remain in what the state has determined to be an appropriate private school placement amounts to no choice at all."). There is no separate requirement of a court finding of appropriateness; rather, the obligation arises automatically from a determination that the private school is the protected status quo during the period in which the dispute resolution process is ongoing. Indeed, Ridley admitted as much before the district court in this case when it acknowledged that the court would have been "obliged" to order reimbursement if the parents had sought the funds through a timely counterclaim. *Ridley II*, 2012 WL 3279230, at *8 n.8. We think it pointless to insist on a formal demand for interim tuition reimbursement when there is no viable response to that demand.

22

Hence, plaintiffs secured the right to reimbursement when the hearing officer ruled in their favor in April 2009. We must now consider whether that right survived the subsequent district court ruling in favor of the school district.

## B.  The Current Educational Placement

Ridley contends that any reimbursement entitlement the parents may have had under § 1415(j) dissolved in February 2011, when the district court reversed the hearing officer's decision.  The school district argues that the court ruling "rendered the hearing officer's decision inoperative" and reinstated the public school as E.R.'s stay-put placement, making the parents ineligible for private-school reimbursement at the time they requested payment from the school district in March 2011.  At that point, according to Ridley's theory, the parents' unilateral decision to send E.R. to Benchmark no longer had the state imprimatur that made reimbursement appropriate.  Ridley's position thus depends on whether the district court's ruling in fact recalibrated the stay-put assessment.

This court observed in *Drinker* that "'the dispositive factor in deciding a child's "current educational placement" should be the Individualized Education Program  . . . actually functioning when the "stay put" is invoked.'"  78 F.3d at 867 (quoting *Woods*, 20 Indiv. Disabilities Educ. L. Rep. at 440).  According to Ridley, plaintiffs did not invoke the stay-put until after the district court determined that the school district's IEP was appropriate and, hence, the original IEP, "placing the student in the school district, is the one now 'actually functioning.'"

23

Ridley's argument lacks support in the law. The operative placement is not determined by the date the parents seek reimbursement for stay-put expenses, but by the date the dispute between the parents and the school district "'first arises'" and proceedings conducted pursuant to the IDEA begin. *Id.* (quoting *Thomas,* 918 F.2d at 625). At the latest, the pertinent proceedings in this case began with the parents' filing of their due process complaint in December 2008, at which point E.R.'s current placement was the public school. *See A.D.*, 727 F.3d at 915 ("[A] stay-put placement is effective from the date a student requests an administrative due process hearing."); *D.F. v. Collingswood Borough Bd. of Educ.*, 694 F.3d 488, 492 (3d Cir. 2012) ("By filing the [due process] petition, A.C. triggered the IDEA's 'stay-put' requirement."). As described above, however, E.R.'s operative placement switched by law to the private Benchmark School when the administrative hearing officer agreed with the parents that Ridley had not offered the child a FAPE in the public school.

Nothing in the statute or this circuit's law provides a basis for changing E.R.'s stay-put placement back to the public school during the pendency of the dispute process, notwithstanding the school district's successful appeal of the administrative decision. To the contrary, § 1415(j) states that the child shall remain in the current educational placement "until *all* [IDEA] proceedings have been completed" (emphasis added). We cannot conclude that Congress intended a placement based on an agreement with "the State or local educational agency" to be less secure than one based on an IEP. *Id.* Indeed, any other conclusion would be at odds with our expressly stated understanding that the stay-put provision is designed to ensure educational stability for

24

children with disabilities until the dispute over their placement is resolved, "'*regardless of whether their case is meritorious or not.*'" *Drinker*, 78 F.3d at 864 (quoting *Woods*, 20 Indiv. Disabilities Educ. L. Rep. at 440) (emphasis added); *see also A.D.*, 727 F.3d at 914 (stating that "a student who requests an administrative due process hearing is entitled to remain in his educational placement regardless of the strength of his case or the likelihood he will be harmed by a change in placement"); *Joshua A. v. Rocklin Unified Sch. Dist.*, 559 F.3d 1036, 1040 (9th Cir. 2009) ("[T]he stay put provision acts as a powerful protective measure to prevent disruption of the child's education throughout the dispute process."); *Mackey v. Bd. of Educ.*, 386 F.3d 158, 160-61 (2d Cir. 2004) (quoting the *Drinker* language above).

Thus, under the statute and this court's precedent, E.R.'s pendent placement under § 1415(j) remained the Benchmark School through at least the conclusion of the proceedings in the district court, and the school district's correlative obligation to pay for her schooling there also remained intact. The only remaining question is whether Ridley's financial responsibility extended through final judgment in the appeals court.

## C. The Duration of the School District's Reimbursement Obligation

Ridley asserts that its responsibility to finance E.R.'s pendent placement at Benchmark terminated, at the latest, when the district court ruled in favor of the school district on plaintiffs' IDEA claim. This court previously has held that § 1415(j) requires a school district to pay for a private school that is a pendent placement through the date of a district

court's final order in an IDEA case. *See Drinker*, 78 F.3d at 867. The court has not, however, addressed whether the stay-put provision also applies through the pendency of an IDEA dispute in the Court of Appeals. The only two circuits to have decided the issue in published opinions are split. *Compare Joshua A.*, 559 F.3d at 1038-40 (holding that stay-put obligation extends through appeals decision), *with Andersen v. Dist. of Columbia*, 877 F.2d 1018, 1023-24 (D.C. Cir. 1989) ((holding that Congress did not intend stay-put financing to cover federal appellate review). *See also Kari H. v. Franklin Special Sch. Dist.*, 125 F.3d 855 (6th Cir. 1997) (table), 1997 WL 468326, at *6 (Nos. 96-5066, 5178) (Aug. 12, 1997) (following *Andersen*); *N. Kitsap Sch. Dist. v. K.W.*, 123 P.3d 469, 483 (Wash. App. Ct. 2005) (holding that stay-put period extends "throughout the *entire* process, including any appeals").

Having now considered the question, we agree with the Ninth Circuit – and the district court in this case – that the statutory language and the "protective purposes" of the stay-put provision lead to the conclusion that Congress intended stay-put placement to remain in effect through the final resolution of the dispute. *Ridley II, 2012* WL 3279230, at *11. The statute's text is broadly written to encompass "the pendency of *any* proceedings conducted pursuant to this section." 20 U.S.C. § 1415(j) (emphasis added). Narrowing the provision's scope to exclude the appellate process strikes us as an unnatural reading of such expansive language. The "proceedings" specifically covered by § 1415 include civil actions in "a district court of the United States." *Id.* § 1415(i)(2)(A). The district court reasonably construed that reference to include all phases of the federal proceedings that begin with a district court filing: "Although Congress did not

26

explicitly articulate that an appeal is a 'proceeding' under § 1415, it seems intuitive that an appeal is part of a 'civil action . . . in a district court of the United States.' . . . In drafting § 1415(j), Congress surely understood that district court review would necessarily include an appeal to a circuit court." *Ridley II*, 2012 WL 3279230, at \*11; *see also Joshua A.*, 559 F.3d at 1038 ("By giving Joshua the right to appeal the ALJ's decision to the district court, § 1415 also made it possible for Joshua to appeal the dispute to this circuit court.").

Even if we had doubts about the clarity of the language itself, we would nonetheless adopt the same construction because that "reading . . . 'best accords with the overall purposes of the statute.'" *Nugent v. Ashcroft*, 367 F.3d 162, 170 (3d Cir. 2004) (quoting *Moskal v. United States*, 498 U.S. 103, 116-17 (1990)), *overruled on other grounds by Al-Sharif v. U.S. Citizenship & Immigration Servs.*, 734 F.3d 207 (3d Cir. 2013) (en banc)); *see also Long v. Tommy Hilfiger U.S.A., Inc.*, 671 F.3d 371, 375 (3d Cir. 2012) (noting that, in addition to language and context, we "consider the 'overall object and policy of the statute, and avoid constructions that produce odd or absurd results or that are inconsistent with common sense'" (quoting *Disabled in Action of Pa. v. Se. Pa. Transp. Auth.*, 539 F.3d 199, 210 (3d Cir. 2008))). We have stated consistently that the stay-put provision is designed to preserve the status quo "'until the dispute with regard to [the child's] placement is ultimately resolved.'" *Drinker*, 78 F.3d at 864 (quoting *Woods,* 20 Indiv. Disabilities Educ. L. Rep. at 440); *see also, e.g., Pardini*, 420 F.3d at 190; *J.O. v. Orange Twp. Bd. of Educ.*, 287 F.3d 267, 272 (3d Cir. 2002). We cannot sensibly find that a FAPE dispute is "ultimately resolved" before proceedings have run their course through a final, unappealed decision by an

administrative body or an appellate judicial decision. *See Joshua A.*, 559 F.3d at 1040 ("It is unlikely that Congress intended the protective measure to end suddenly and arbitrarily before the dispute is fully resolved.").

Moreover, the rationale that underlies a school district's obligation to finance a child's pendent placement remains compelling through the appellate process. If we concluded that stay-put protection terminates while an appeal is pending, the parents of a child with disabilities would be faced with the untenable choice of removing their child from a setting the appeals court might find appropriate or risking the burden of private school costs they cannot afford for the period of the appeal. *See, e.g., Joshua A.*, 559 F.3d at 1040; *Raelee S.,* 96 F.3d at 86-87. In addition,

> cutting off stay-put protection after district court review has potential negative consequences in other factual scenarios besides private school placement. For instance, the stay-put provision could have been invoked during the pendency of an appeal to maintain a child's special services within the school district or to maintain a child's placement in a mainstream rather than a self-contained classroom.

*Ridley II*, 2012 WL 3279230, at *12 n.10. The broad reading of § 1415(j) thus aligns with the statute's important mission

28

to guarantee educational stability for all children with disabilities until there is a *final* ruling on placement.

The wisdom of this reading of § 1415(j) is reinforced by the Department of Education's implementing regulation, which states explicitly that the child must remain in his or her current educational placement "during the pendency of "*any . . . judicial proceeding* regarding a due process complaint." 34 C.F.R. § 300.518(a) (emphasis added). The unbounded reference to "any" judicial proceeding plainly extends the mandate through the conclusion of the appellate process, and the agency's view of the statute's reach thus mirrors our own. If we had considered § 1415(j) ambiguous on the issue of duration, we would have been obliged to give deference to this permissible construction by the agency. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984); *Castillo v. Att'y Gen.*, 729 F.3d 296, 302 (3d Cir. 2013). Every appropriate interpretive path thus leads us to the same conclusion.

The D.C. Circuit in *Andersen* adopted the contrary interpretation based on a view of the IDEA's purpose that we believe is unjustifiably limited. The *Andersen* court focused on the Supreme Court's decision in *Honig v. Doe*, where the issue was whether school districts may be excused from the stay-put requirement when a child's continuing presence in the classroom poses a danger to himself or others. *See Honig*, 484 U.S. at 323; *Andersen*, 877 F.2d at 1023-24. In rejecting such an exception,[13] the Supreme Court observed that "one of

---

[13] The IDEA does allow certain temporary exceptions to the pendent-placement provision, including for students carrying a weapon to school, using or selling drugs at school,

29

the purposes of § 1415[(j)] . . . was 'to prevent *school* officials from removing a child from the regular public school classroom over the parents' objection pending completion of the review proceedings,'" *Honig*, 484 U.S. at 327 (quoting *Burlington*, 471 U.S. at 373). The Court emphasized the incompatibility of the asserted unilateral authority to exclude students perceived as dangerous with the IDEA's goals, *see id.* at 323, 327, and pointed out that school officials faced with a safety issue could, among other steps, seek court intervention under the IDEA if "parents of a truly dangerous child adamantly refuse to permit any change in placement," *id.* at 326.

The D.C. Circuit appeared to treat *Honig* as establishing a single goal for the stay-put provision, i.e., "to protect children from *unilateral* displacement *by school authorities.*" 877 F.2d at 1024. The court thus reasoned that the automatic stay-put injunction is no longer justified once a district court has decided in favor of a proposal by school officials to transfer a student: "Once a district court has rendered its decision approving a change in placement, that change is no longer the consequence of a unilateral decision by school authorities; the issuance of an automatic injunction perpetuating the prior placement would not serve the section's purpose." 877 F.2d at 1024. Based on this

---

or inflicting serious bodily injury on others. *See* 20 U.S.C. § 1415(k)(1)(G); *see also Honig*, 484 U.S. at 325 & n.8 (citing a Department of Education position that a ten-day suspension "does not amount to a 'change in placement' prohibited by § 1415[(j)]").

assumption about the role of § 1415(j), the *Andersen* court held that, after a court has endorsed the school district's educational plan for a disabled child, the child's parents may prevent a change in placement consistent with the court ruling only by satisfying the standard requirements for injunctive relief. *Id.*

In our view, there is a flaw in the D.C. Circuit's reasoning. The Supreme Court has not declared protection from unilateral action by school officials to be the *only* purpose of the stay-put provision. Rather, the Court identified it in *Honig* as "*one* of [the section's] purposes." 484 U.S. at 327 (emphasis added); *see also id.* (describing "the unilateral exclusion of disabled children by schools" as "*one* of the evils Congress sought to remedy" (emphasis in first phrase omitted) (emphasis in second phrase added)); *Burlington*, 471 U.S. at 373 ("We think *at least one purpose* of § 1415[(j)] was to prevent school officials from removing a child from the regular public school classroom over the parents' objection pending completion of the review proceedings." (emphasis added)). As we have just explained, the pendent-placement requirement also reflects a concern about the continuity of a child's placement generally. *See A.D.,* 727 F.3d at 916 ("[T]he purpose of the stay-put provision . . . is to protect students from changes to their educational programs when there is a dispute over the lawfulness of the changes."); *K.W.*, 123 P.3d at 482 ("[T]he holding in *Andersen* does not follow the general policy behind IDEA, which is to keep from disturbing the child throughout the statutory process designed to resolve disputes between the school district and the child's parents or guardians over where the child can receive the appropriate educational opportunities."). The D.C. Circuit's limited

31

perspective in *Andersen* undermines its conclusion that the stay-put protection, which triggers the school district's reimbursement obligation, does not extend through the period of an appeal.[14]

## V.

We are not insensitive to the financial burden our decision will impose on school districts, *see Raelee S*, 96 F.3d at 87, or the seeming incongruity of the ultimately prevailing party having to pay for a now-rejected placement. Despite two judicial determinations that Ridley did not deny E.R. a FAPE, the school district will be assessed the cost of her private school education for a substantial period of time.[15] It is impossible, however, to protect a child's educational status quo without sometimes taxing school districts for private education costs that ultimately will be deemed unnecessary by a court. We see this not as "an absurd result," *Ridley II*, 2012 WL 3279230, at *13, but as an unavoidable consequence of the balance Congress struck to ensure stability for a vulnerable group of children.

*Affirmed.*

---

[14] The plaintiffs in this case did not seek Supreme Court review of the appeals court ruling in *Ridley I*, and we therefore do not address whether stay-put protection encompasses such proceedings.

[15] As noted above, the reimbursement period runs from the date of the administrative hearing officer's decision in April 2009 – i.e., shortly before the end of the 2008-2009 school year – through the date of the appellate decision in May 2012.